Robert Chalfant (State Bar No. 203051)
ROBERT CHALFANT LAW, PC
13620 Lincoln Way, Suite 325
Auburn, CA 95603
Telephone:      (916) 647-7728
Facsimile:      (916) 930-6093
Email:          robert@rchalfant.com

Attorney for Plaintiffs
CHRISTINA WIND, CATRINA CAMERON,
JAMIE MONROE, SHANNON GUTIERREZ,
ANNA SALINAS, WISDOM MUHAMMAD,
ANTOINETTE YANCEY, DONYETTE
CLARK, ELAINE DE LEON GUERRERO,
TANESHA RANDOLPH, REINA REYES,
AMILIA MANZANO and NICOLE MILAN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| CHRISTINA WIND, CATRINA CAMERON, ANTOINETTE YANCEY, DONYETTE CLARK, JAMIE MONROE, SHANNON GUTIERREZ, ANNA SALINAS, WISDOM MUHAMMAD, ELAINE DE LEON GUERRERO, TANESHA RANDOPLH, REINA REYES, AMILIA MANZANO and NICOLE MILAN, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF CALIFORNIA, CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR), ANISSA DE LA CRUZ, FERNANDO ARROYO, C. MENDOZA, MICHAEL FELIX, VALERIANO RAMOLETE, OFFICER BECERRA, YESSICA ABREGO and DOES 1 to 60, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATION OF CIVIL AND CONSTITUTIONAL RIGHTS** <br><br> **DEMAND FOR JURY TRIAL** |

1

**INTRODUCTION**

In the months leading up to August 2, 2024, Sergeant FERNANDO ARROYO ("ARROYO") had been growing increasingly unhappy that female prisoners at CCWF were filing lawsuits and Prison Rape Act Elimination ("PREA") complaints against officers for committing "Staff Sexual Abuse" which is defined by CDCR as "[A]ny threatened, coerced, attempted, or completed sexual contact, assault or battery between staff and offenders."

ARROYO decided that he was going to retaliate against all of the women confined in cell block 513 (also known as "D Yard" or "Delta Yard") for the filing of lawsuits and PREA complaints (159 female prisoners were housed in 513), by conducting a search of every single cell in housing unit 513 and taking away all of the female inmates' rights and privileges.

On August 2, 2024, ARROYO followed through after threats of retaliation and commenced a search of all cells in 513. All 159 female inmates in Delta Yard were removed from their cells at ARROYO's direction, taken to the cafeteria, and locked inside the building. While confined in the cafeteria, the inmates saw their personal property being thrown into the trash in violation of CDCR rules regarding the destruction of property. Inmates on the Inmate Advisory Council asked to speak with ARROYO to discuss their concerns.

ARROYO responded with violence, ordering a lockdown of the entire CCWF prison and summoning all guards from CCWF and two other local prisons to respond to the cafeteria. Once at the cafeteria, ARROYO refused to speak with anyone and instead began ordering correctional officers to form a skirmish line to intimidate the female inmates. ARROYO then gave orders to use pepper spray, throw tear gas grenades, fire rubber bullets and assault and batter the women, even though all of the female inmates were complying with officers' orders and posed no threat to any officer.

The Plaintiffs in this case sustained serious injuries from ARROYO's unlawful acts and the use of excessive force by ARROYO and the officers at his direction and command.

**JURISDICTION AND VENUE**

1.      This Court has original jurisdiction of the federal claims under 28 U.S.C.§ 1331 (in that they arise under the United States Constitution) and § 1343(a)(3) (in that the action is brought to address deprivations, under color of authority, of rights, privileges, and immunities secured by the United States

Constitution). This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Eastern District of California and because the acts and/or omissions stated herein occurred in the Eastern District of California.

3. Intra-district venue is proper in the Fresno Division of the Eastern District of California pursuant to E.D. Cal. L.R. 120(d) because the claims asserted herein arise from acts and/or omissions which occurred in the County of Madera.

## EXHAUSTION

4. All Plaintiffs, except AMILIA MANZANO and NICOLE MILAN, submitted timely Government Claims to the STATE OF CALIFORNIA regarding the claims alleged in this action. This action is timely filed after receiving rejection notices on several of the claims, and others being rejected under operation of law. Plaintiff AMILIA MANZANO and NICOLE MILAN are not pursuing any state law claims.

5. All Plaintiffs timely submitted 602 Grievances, as required by CDCR rules, and have exhausted all levels of appeal.

## PARTIES

6. CHRISTINA WIND, CATRINA CAMERON, ANTOINETTE YANCEY, DONYETTE CLARK, JAMIE MONROE, SHANNON GUTIERREZ, ANNA SALINAS, WISDOM MUHAMMAD, ELAINE DE LEON GUERERRO, TANESHA RANDOLPH, REINA REYES, AMILIA MANZANO and NICOLE MILAN ("PLAINTIFFS") are all residents of the State of California and are all currently housed as inmates at the Central California Women's Facility, in Chowchilla, California.

7. Defendant STATE OF CALIFORNIA employed all individual Defendants in this action, and all individual Defendants acted within the course and scope of their employment. Defendant STATE OF CALIFORNIA is properly named as a Defendant for Plaintiff's claims under Civil Code Section 52.1 (the Bane Act) and state law claims.

8. Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") is an agency of the State of California. Defendant CDCR is properly named as a Defendant for Plaintiff's claims under Civil Code Section 52.1 (the Bane Act) and state law

3

claims.

9. Defendant ANISSA DE LA CRUZ is, and at all times material herein was, the Warden of Central California Women's Facility ("CCWF"), located in Chowchilla, California. ANISSA DE LA CRUZ was acting within the course and scope of her employment and under color of state law at all relevant times. ANISSA DE LA CRUZ is sued in her individual capacity.

10. FERNANDO ARROYO is, and at all times material herein was, a Correctional Officer, holding the rank of Sergeant, employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant FERNANDO ARROYO is sued in his individual capacity.

11. Captain C. MENDOZA is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant C. MENDOZA is sued in his individual capacity.

12. Officer VALERIANO RAMOLETE is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant Officer V. RAMOLETE is sued in his individual capacity.

13. Officer BECERRA is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant Officer BECERRA is sued in his individual capacity.

14. Sergeant MICHAEL FELIX is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant MICHAEL FELIX is sued in his individual capacity.

15. Officer YESSICA ABREGO is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of her employment and under color of state law. Defendant Officer ABREGO is sued in her individual capacity.

16. Defendants DOES 1 to 60 are and/or were agents or employees of the State of California, acting within the course and scope of their employment and under color of state law. Defendants DOES 1

4

to 60 true and correct names and identities are not currently known. Defendants DOES 1 to 60 are sued by their fictitious names and true and correct names and identities will be submitted when ascertained.

## GENERAL ALLEGATIONS

17.     At all times relevant herein, all wrongful and unlawful acts described herein were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

18.     In 2006, the California Department of Corrections and Rehabilitation ("CDCR"), adopted a Prison Rape Elimination Act Policy ("PREA"), which declares that CDCR has "zero tolerance for sexual violence, staff sexual misconduct and sexual harassment in its institutions," and that all "sexual violence, staff sexual misconduct, and sexual harassment is strictly prohibited." See Department of Corrections and Rehabilitation Operations Manual ("DOM"), Article 44, Section 54040.1 "Policy".

19.     "Staff Sexual Misconduct" is defined in the PREA policy as "Any threatened, coerced, attempted, or completed sexual contact, assault or battery between staff and offenders." See "Definitions", DOM at Section 54040.3.

20.     Inmates "may report violations of [the PREA policy] to any staff member verbally or in writing, utilizing the Inmate Appeals Process, through the sexual assault hotline or through a third party." See "Detection, Notification, and Reporting" DOM at Section 54040.7.

21.     "Retaliatory measures against… offenders who report incidents of sexual violence, staff sexual misconduct or sexual harassment… shall not be tolerated and shall result in disciplinary action and/or criminal prosecution. Retaliatory measures include, but are not limited to, coercion, threats of punishment, or any other activities intended to discourage or prevent a staff or offenders from reporting the incident(s) or cooperating with investigation of an incident." See DOM, Section 54041 "Policy".

22.     Many inmates at CCWF are afraid to file PREA complaints because correctional officers employed at CCWF frequently retaliate against the inmates, and/or the inmates' claims are ignored allowing the staff sexual misconduct to continue with no repercussions.

23.     Hundreds of women have now filed lawsuits against the State of California alleging they were sexually assaulted by correctional officers employed at CCWF. Millions of dollars in damages have been paid in settlement of these claims.

5

**EVENTS LEADING UP TO AUGUST 2, 2024**

24.    Prior to August 2, 2024, Sergeant ARROYO was growing increasingly unhappy that inmates were filing lawsuits and PREA complaints alleging "staff sexual misconduct" against correctional officers employed at CCWF.

25.    In December of 2023, ARROYO had been named as a defendant in a lawsuit filed by 144 women alleging sexual assault and battery at CCWF.

26.    Prior to August 2, 2024, ARROYO had been telling inmates to stop "weaponizing" PREA and to stop filing PREA complaints against officers.

27.    Plaintiff ANTOINETTE YANCEY ("YANCEY"), who serves on the Inmate Advisory Council ("IAC"), had frequent interaction with ARROYO in the months leading up to August 2, 2024, due to her position on the IAC.

28.    ARROYO had been telling YANCEY that she needed to "get the inmates under control" and that "if she did not get the inmates to stop filing PREA complaints against his officers" he was going to search every cell in building 513, which houses 159 women, and throw away their property.

29.    ARROYO informed YANCEY that he would institute Program Security Restriction ("PSR"), which meant every inmate would be placed in lockdown and lose all privileges with no exceptions. This meant a form of extended punishment where all inmates would lose the ability to leave their cell, and have no canteen, family care boxes, outside or dayroom breaks, laundry, and group activities. Additionally, the inmate's property would be disposed of through mass searches.

30.    YANCEY informed ARROYO that she could not prevent inmates from filing PREA complaints against the officers who sexually assault them, and that the inmates had the right under CDCR rules to file complaints.

31.    Prior to August 2, 2024, ARROYO had also informed DONYETTE CLARK ("CLARK") that he was unhappy about inmates filing PREA complaints against officers and that if the PREA complaints did not stop he would search all of the cells on Delta Yard and people would lose their property.

32.    CLARK told ARROYO that she did not have the ability to stop anyone from filing a PREA complaint against an officer for sexual abuse and those inmates had the right to file complaints.

6

33.    ARROYO had also informed TANESHA RANDOLPH ("RANDOLPH") and the other inmates housed in 513 that "If you don't stop filing PREA, this unit was going First Watch."

34.    "First Watch" meant that the inmates in 513 would have no movement at CCWF, no canteen services or programming, and would be confined to their cells for 24 hours a day, losing all privileges.

35.    PLAINTIFFS knew that ARROYO was unhappy with inmates filing lawsuits and PREA complaints. Plaintiffs had previously filed PREA complaints and/or knew others that had in 513 and were afraid of ARROYO's threats of retaliation and punishment.

36.    PLAINTIFFS were particularly afraid of ARROYO as he is the leader of the "Delta Dogs" prison gang. Captain MENDOZA, Officer RAMOLETE and Officer BECERRA are also members of the "Delta Dogs."

37.    The "Delta Dogs" are a criminal gang composed of Delta Yard custodial officers who unlawfully intimidate and harass female inmates through the use of verbal, physical, and sexual abuse, the filing of false Rules Violations Reports ("RVRs" or "115s"), confinement in administrative segregation, and various acts of retaliation.

38.    The "Delta Dogs" practice a "Code of Silence" to conceal their misconduct. Additionally, the "Delta Dogs" falsely charge inmates with criminal violations or CDCR Rules Violations to punish innocent inmates, increase their period of confinement and eliminate housing changes or parole chances.

39.    RVR's or 115's are filed by "Delta Dogs" to cover for misconduct committed by other "Delta Dogs" members. The "Delta Dogs" know that by charging rules violations and finding innocent inmates guilty of rules violations inmates cannot obtain relief through CDCR administrative processes or the court system for the wrong and unlawful acts of officers employed at CCWF.

40.    Some of the "Delta Dogs" wear a badge or emblem of a pit bull on their prison issued uniforms to signify their inclusion in the gang and to intimidate female inmates.

41.    Instead of taking action to investigate and stop the rapists and sexual abusers employed by CDCR at CCWF, ARROYO and members of the "Delta Dogs" decided they were going to send a message to all of the female inmates in housing unit 513 that PREA complaints should not be filed, by placing all of 513 on "First Watch" and "PSR".

7

42.     When the staff sexual abuse of inmates did not stop and PREA complaints continued to be filed, ARROYO sought permission from Captain Castillo to retaliate and search all of the cells in 513.

43.     ARROYO informed Captain Castillo that the reason he wanted to search all of the cells was to send a message to female inmates housed in Delta Yard that PREA complaints should not be filed against officers at CCWF.

44.     Captain Castillo informed ARROYO that he could not search all of the cells in 513 as it was in violation of CDCR's PREA rules prohibiting retaliation and denied the request.

45.     ARROYO then sought out Captain C. MENDOZA ("MENDOZA") to see if he would grant permission to place 513 on "PSR" or "First Watch" and search every cell in 513 for the purpose of sending a message to female inmates that PREA complaints should not be filed against officers at CCWF.

46.     MENDOZA agreed with ARROYO and granted ARROYO's request to search all of the cells in 513 and go "First Watch" and/or "PSR."

47.     MENDOZA and ARROYO then met with Warden ANISSA DE LA CRUZ, ("DE LA CRUZ") and informed her of the reasons why they wanted to search all of the cells in 513.

48.     DE LA CRUZ agreed that a search of all of the cells in 513 was warranted and authorized the search.

49.     ARROYO, with DE LA CRUZ's permission, had summoned guards from Pleasant Valley State Prison and Valley State Prison to assist in the search. Approximately 70 guards were present to search all of the cells in Delta Yard.

**AUGUST 2, 2024**

50.     After waking up the female inmates on the morning of August 2, 2024, custodial officers removed every inmate in cell block 513 (159 inmates) from their cell and ARROYO directed them to go to the cafeteria.

51.     ARROYO then had officers begin the process of searching every cell in 513.

52.     The search went on for several hours and during that time the female inmates in the cafeteria were not provided necessary medications, food, or water, even though the search continued during the scheduled times for pill call, breakfast and lunch.

8

53.    ARROYO and MENDOZA ordered the cafeteria workers not to feed the inmates.

54.    An unknown sergeant arrived at the cafeteria and instead of deescalating the situation, informed the female inmates that their personal property was being thrown into the trash. This Sergeant told the inmates "They are throwing your shit out" which caused the inmates to become upset.

55.    Disposing of personal property is a violation of CDCR rules and deprived the female inmates of their Due Process rights under the U.S. Constitution. CCWF Officers are required to identify property items withheld on a confiscation form and follow a process that allows the inmate to challenge the taking of property and seek its return.

56.    Instead, the officers requested trash bins and were throwing away the inmates' personal property in violation of CDCR rules. The female inmates saw their belongings being wheeled by in plain view in trash carts.

57.    PLAINTIFFS were in the cafeteria and saw an inmate pass out due to the heat and having not received her medications and food that day. Inmates immediately began calling for medical assistance and an alarm was activated.

58.    Once the medical assistance alarm was activated, ARROYO and MENDOZA locked down the entire prison and summoned every correctional officer on duty at CCWF to respond to the cafeteria.

59.    Once all of the officers arrived at the cafeteria, ARROYO directed the correctional officers to form a "skirmish line" around the female inmates and began advancing in a tactical formation while the female inmates huddled in a circle and begged officers not to hurt them.

60.    ARROYO began yelling orders at the officers while the female inmates begged for medical providers to come assist the inmate who had lost consciousness. ARROYO ignored the inmates' requests to allow medical providers to treat the inmate that had a medical emergency.

61.    ARROYO ordered officers to turn off their body worn cameras and then tapped an officer on the shoulder and gave him the command to start spraying the female inmates with pepper spray.

62.    CHRISTINA WIND, CATRINA CAMERON, ANTOINETTE YANCEY, DONYETTE CLARK, JAMIE MONROE, SHANNON GUTIERREZ, ANNA SALINAS, WISDOM MUHAMMAD, ELAINE DE LEON GUERERRO, TANESHA RANDOLPH, REINA REYES, AMILIA MANZANO

9

and NICOLE MILAN were sprayed with pepper spray by officers at ARROYO's command and directions.

63. PLAINTIFFS had complied with all previous orders from officers and had not done anything that would warrant any use of force by officers prior to being sprayed with pepper spray.

64. ARROYO then took a tear gas grenade and threw it at the compliant group of female inmates, which included all PLAINTIFFS.

65. ARROYO then ordered all of the other officers to start throwing tear gas grenades at the compliant group of female inmates, including PLAINTIFFS.

66. No inmate had done anything that would warrant the use of tear gas grenades being used, and their use was expressly prohibited by CDCR rules.

67. CDCR rules prohibit the use of tear gas grenades as explosive devices used to cause injury. The officers were throwing the tear gas grenades directly at the inmates so that they would explode on or near them to cause injury.

68. PLAINTIFFS were completely covered in pepper spray as officers were emptying their entire cans of pepper spray directly into the inmates' faces at close range.

69. Sergeant MICHAEL FELIX ("FELIX") and Officer VALERIANO RAMOLETE ("RAMOLETE") were both present and screaming at the inmates.

70. CHRISTINA WIND ("WIND") and CATRINA CAMERON ("CAMERON") were compliant and following the officers' orders.

71. An unknown officer ordered WIND and CAMERON to step forward and motioned with his hand.

72. WIND and CAMERON stepped forward as ordered, and before they even took a full step, FELIX and RAMOLETE took their industrial-sized cans of pepper spray and emptied the entire contents in WIND's and CAMERON's faces at close range, even though they were following officers' direct orders.

73. WIND begged the officers to stop spraying them with pepper spray, as she knew that CAMERON had a pacemaker and had previously been diagnosed with severe asthma. WIND knew that CAMERON could possibly die from being pepper-sprayed and tear-gassed.

10

74. CAMERON, unable to breathe and having a severe asthma attack, fell to the ground and WIND used her own body to try to shield CAMERON from the pepper spray now being sprayed at them by FELIX, RAMOLETE and others.

75. WIND attempted to put her T-shirt over CAMERON's face as the officers continued to spray them with pepper spray.

76. ARROYO commanded officers with batons to begin beating WIND and CAMERON, and officers complied, savagely beating the two defenseless women who had complied with all previous orders.

77. WIND attempted to lay on top of CAMERON to shield CAMERON from being struck with batons, punched and kicked by officers who were now physically assaulting the injured and defenseless women.

78. ARROYO and MENDOZA were yelling orders for the officers to continue spraying pepper spray and throwing tear gas grenades at the female inmates that were already down on the floor after hearing the alarm.

79. ARROYO then took another tear gas grenade and threw it at the compliant group of women, including all PLAINTIFFS. ARROYO then ordered other officers to start throwing additional tear gas grenades at the women and the officers again complied.

80. No warnings were given by ARROYO, MENDOZA or the other officers that tear gas grenades and pepper spray would be used prior to their use.

81. No inmate had done anything at this point that would justify or warrant any use of force. No officer had been threatened, touched, kicked or attacked by any inmate. ARROYO and MENDOZA were having officers violently assault inmates even though they were complying with all directions and orders.

82. ARROYO, intent on dehumanizing the people he had sworn an oath to protect, had clearly lost his mind at this point and was simply yelling orders designed to inflict pain and suffering on inmates who had broken no CDCR rules and who posed no threat to any officers.

83. The other officers present, including a Lieutenant, Sergeant FELIX, Officer BECERRA, Officer RAMOLETE, Officer ABREGO and dozens of unknown correctional officers, failed to have the

backbone to stand up to ARROYO's and MENDOZA's unconstitutional commands, and failed to intervene to stop the one-sided war on the inmates in their care and custody.

84.    ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and others all watched countless officers violating the constitutional rights of PLAINTIFFS through the use of excessive and unnecessary force, had the ability to intervene to stop the violent attacks and failed to act to stop the unnecessary violence.

85.    While the full-scale assault was occurring, several of the female inmates were having seizures and other medical emergencies due to being covered in pepper spray and tear gas grenades filling the room with tear gas.

86.    The officers deploying pepper spray and tear gas all wore gas masks to protect themselves from the harmful irritants.

87.    Pepper spray has been determined to cause cardiac arrest in healthy individuals. Tear gas has been proven to cause immediate and long-term health effects from exposure, including glaucoma, blindness, and respiratory failure.

88.    A 2017 study of data collected over 25 years examined the effects of tear gas on the human body, and determined tear gas can cause severe injuries, permanent disability and death. The use of tear gas can cause death by respiratory failure or cause death by the impact from the exploding canister.

89.    ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and all other officers had received training in the use of pepper spray and tear grenades and knew that pepper spray and tear gas can cause death, respiratory failure, seizures, strokes and blindness.

90.    ARROYO did not allow any medical providers into the cafeteria to assist the female inmates that required medical attention.

91.    The female inmates who begged for medical assistance, for themselves or others, were told to "Shut the fuck up" and then viciously attacked again at ARROYO's and MENDOZA's orders.

92.    PLAINTIFFS were especially vulnerable to the use of pepper spray and tear gas as they had previously diagnosed medical conditions that precluded officers from employing these chemical agents in their presence.

12

93.    PLAINTIFFS suffered severe injuries as a result of ARROYO, MENDOZA, FELIX, RAMOLETE, ABREGO and BECERRA's use of excessive force and the unjustified use of departmentally approved weapons.

**CHRISTINA WIND**

94.    As described above, WIND was sprayed with pepper spray by FELIX and RAMOLETE at ARROYO's direction. Entire cans of pepper spray were sprayed in WIND and CAMERON's faces even though they were complying with all CDCR rules and posed no threat to any person.

95.    Approximately 10 officers violently attacked WIND for attempting to protect CAMERON. WIND was struck with fists and batons and beaten savagely while posing no threat to any officer or inmate. After the incident, her body was covered with bruises, contusions, scrapes and abrasions and the left side of her face was swollen from being slammed on the floor by officers.

96.    WIND was struck in the head by batons with such force that she passed out and lost consciousness. WIND suffered respiratory failure due to the use of chemical agents and was frothing at the mouth and vomiting while unconscious.

97.    Once WIND regained consciousness, the left side of her face was sagging and it would have appeared to any trained person that she was suffering a stroke. Unknown correctional officers continued to beat her after seeing her condition and after she was rendered completely helpless and zip-ties placed on her wrists.

98.    ARROYO commanded his officers to beat WIND with batons even though she was unconscious and completely defenseless.

99.    WIND was eventually dragged from the cafeteria to a grassy area outside.

100.    Once WIND regained consciousness, WIND begged for medical assistance. ARROYO ordered officers and medical providers not to assist or render aid to WIND.

101.    WIND was not provided medical treatment after the violent assault and was simply sent to administrative segregation ("Ad-Seg.") where she spent 11 days in isolation. After returning to her cell, her cellmates noted that the left side of her face was still sagging.

102.    When WIND was finally examined by medical providers, it was determined that she had internal swelling and had likely suffered a stroke.

13

103.    WIND is still suffering daily from being violently attacked and experiences mental and emotional distress and daily pain and discomfort.

104.    Video exists of WIND and CAMERON being sprayed with pepper spray, having tear gas grenades thrown at them and the violent beating of WIND and CAMERON by approximately 10 officers with batons.

105.    Internal Affairs ("IA") officers from Sacramento apologized to WIND after arriving at CCWF and she was immediately released from Ad-Seg.

## CATRINA CAMERON

106.    ARROYO ordered officers to throw tear gas grenades at WIND and CAMERON while they lay on the ground gasping for air. At least three tear gas grenades exploded next to or on CAMERON while she was motionless on the floor.

107.    Sergeant MICHAEL FELIX ripped off CAMERON's prescription eyeglasses during the violent attack by officers and intentionally stepped on them to destroy them.

108.    ARROYO and the officers who were attacking the inmates at his direction were laughing as they carried out their attack.

109.    CAMERON completely lost her eyesight after the violent assault as a result of RAMOLETE and FELIX spraying their entire cans of pepper spray directly into her eyes and being subjected to prolonged exposure to tear gas.

110.    Medical staff at CCWF have informed her that she is legally blind and has a disability. CAMERON was issued a prison vest that indicates she is vision impaired.

111.    CAMERON was denied medical treatment by ARROYO after the incident. CAMERON was covered in bruises, abrasions, pepper spray and tear gas after the incident but ARROYO would not allow CAMERON to be sent for decontamination or be seen by medical providers.

112.    CAMERON had a seizure after being subjected to pepper spray and tear gas after being returned to her cell. CAMERON was denied the ability to see a medical provider after being returned to her cell and having a seizure.

113.    CAMERON is currently waiting to be seen by an ophthalmologist and cardiologist for her injuries. CAMERON continues to experience mental and emotional distress from the violence inflicted

14

upon her on August 2, 2024.

**ANTOINETTE YANCEY**

114.    YANCEY had been diagnosed with having a stroke on the morning of August 2, 2024, prior to being attacked by the officers, and was wearing an ADA mobility vest at the time of the attack.

115.    YANCEY had been informed by medical staff that morning to "avoid any stressful situations."

116.    ARROYO knew and was aware that YANCEY had suffered a stroke the morning of August 2, 2024, as he was the officer who responded to the urgent call for medical assistance by YANCEY from her cell.

117.    YANCEY begged ARROYO and the officers not to spray her with pepper spray and throw tear gas grenades at her. ARROYO ordered Officer BECERRA to spray YANCEY with pepper spray even though she was disabled, complying with all of the officers' orders and posed no threat to anyone.

118.    YANCEY was choking on pepper spray and tear gas when she lost consciousness. YANCEY regained consciousness on the floor and began screaming for help.

119.    Officers were running past YANCEY to chase down women who were trying to shield themselves from pepper spray and tear gas grenades.

120.    YANCEY witnessed officers slamming female inmates with mobility assistive devices ("walkers") to the floor and officers throwing tear gas grenades at inmates' heads in violation of CDCR rules prohibiting the use of these devices as explosives intended to cause harm.

121.    YANCEY passed out a second time due to respiratory failure and woke up while being placed in zip-ties.

122.    An unknown officer saw that YANCEY was losing consciousness again and told her "I am going to get you out of here." The officer picked YANCEY up off of the floor and dragged her outside where she was thrown on the ground.

123.    Outside on the grass, temperatures were well over 100 degrees. YANCEY lost consciousness a third time outside on the grass. When YANCEY regained consciousness, she saw officers using pepper spray on female inmates who had been placed in zip ties and officers throwing tear

gas grenades at women in zip ties.

124. YANCEY was sprayed with pepper spray again, even though she was in restraints, and officers threw additional tear gas grenades at her. This continued for approximately 30 minutes outside on the grass.

125. YANCEY saw ARROYO outside on the grass area, and he was directing the officers to pepper spray and throw tear gas grenades at the restrained inmates, including YANCEY, who had been removed from the cafeteria.

126. YANCEY saw officers fist-bumping each other and congratulating themselves for violently assaulting the female inmates.

127. After the incident, YANCEY has had ongoing medical problems with difficulty breathing, panic attacks, a left leg/thigh injury, and is now seeking mental health treatment. YANCEY continues to experience mental and emotional distress after the events of August 2, 2024, and is now classified as Triple CMS (certified as someone who is in urgent need of mental health services).

### DONYETTE CLARK

128. CLARK was sprayed with pepper spray and had tear gas grenades thrown at her in the cafeteria, at ARROYO's direction and on his orders.

129. After being subjected to pepper spray and tear gas, CLARK had a violent seizure and began thrashing around on the floor, something she had never experienced in her life before.

130. CLARK lost consciousness from being repeatedly sprayed with pepper spray and having multiple tear gas grenades exploding around her. CLARK experienced respiratory failure from the tear gas and pepper spray.

131. Instead of providing medical aid to CLARK, ARROYO ordered officers to continue the violent assault.

132. CLARK regained consciousness while she was being dragged outside of the cafeteria by an officer who commented "I saved your life" as he was proud of himself for rescuing CLARK from the war zone created by ARROYO.

133. CLARK was taken to an area outside on the grass near a medical awning where ARROYO was continuing to order officers to use pepper spray and tear gas grenades on restrained

16

inmates. Officers informed CLARK that she had 2 seizures and the officers were laughing about it.

134. CLARK saw ARROYO ordering medical providers not to provide aid to the inmates who were having serious medical issues.

135. CLARK saw inmates being sprayed with pepper spray and having tear gas grenades thrown at them while in zip ties in the grass area.

136. CLARK was eventually placed in a neck brace by medical providers who were attempting to shield her from the 100 plus degree temperatures. CLARK was covered from head to toe in pepper spray and her skin was burning as though she was on fire.

137. At one point, CLARK was told that she was the next to receive treatment. That changed as another inmate began having a seizure next to her, and medical providers had to begin life-saving measures to treat that inmate.

138. CLARK was eventually transported to Mercy Medical Center in Madera for treatment.

139. CLARK had been kicked by an officer while she was unconscious and having a seizure and had a boot print on her CCWF issued clothing. CLARK also had bruises, abrasions and scrapes from the violent assault.

140. CLARK was diagnosed with peripheral vertigo after the incident, which causes her dizziness and has greatly affected her balance and ability to walk.

141. CLARK continues to suffer mental and emotional distress from the incident.

142. CLARK has been unable to return to the cafeteria since August 2, 2024, and has been forced to buy her own food through commissary. This cost her approximately $1200 dollars. CLARK has been diagnosed with PTSD as a result of the trauma that she experienced on August 2, 2024.

**JAMIE MONROE**

143. JAMIE MONROE "(MONROE")" is an ADA inmate and wears a brightly colored mobility vest to signal to staff that she has a medical disability.

144. MONROE had recently been injured while working at CCWF after not being properly trained on how to use a saw at her Prison Industry Authority work assignment.

145. On the day of August 2, 2024, MONROE had 20 staples and 10 stitches in her leg and was not required to get on the floor as directed by officers but did as ordered even though it caused her

17

extreme pain and aggravated her prior injury.

146. Officers in the cafeteria yelled "Get down bitch," at MONROE, even though she was not required to comply, and not required to get down on the ground due to her prior injury.

147. MONROE was sprayed with pepper spray and had tear gas grenades thrown at her, even though she had complied with all orders and directions. This occurred at ARROYO's directions and commands to subordinate officers.

148. MONROE was eventually placed in zip ties and taken to the grass area outside of the cafeteria. Officer ABREGO took a knife and began to remove the zip ties from MONROE so that she could be treated by medical staff.

149. ABREGO took her knife and stabbed MONROE in the hand, causing bleeding and extreme pain.

150. Instead of immediately summoning medical help, ABREGO smiled at MONROE and appeared happy that she had cut MONROE.

151. MONROE had multiple panic attacks the night of August 2, 2024, and continues to have recurring nightmares of being shot by officers and that include seeing the entire area outside the cafeteria covered in blood.

152. CDCR medical providers have prescribed psychiatric medication to MONROE to alleviate the anxiety, depression and night terrors she has experienced since August 2, 2024.

153. MONROE can no longer sit or stand for longer than 20 minutes at a time due to the nerve damage that she suffered on August 2, 2024, and can no longer earn any wages while employed in prison due to her injuries. MONROE is making a wage loss/loss of earning capacity claim in this matter.

154. MONROE is serving a life without parole sentence, and the way she mentally coped with her incarceration was exercise and working out in the gym.

155. MONROE is no longer able to work out due to nerve damage in her leg. MONROE now has to walk with a cane and has a permanent limp.

**ANNA SALINAS**

156. ANNA SALINAS ("SALINAS") was in the cafeteria and complying with all orders and directions at the time that ARROYO ordered officers to pepper spray and throw tear gas grenades at her.

18

157. Once explosions started occurring, SALINAS began experiencing respiratory failure, fell down, hit her head on the floor and started having a seizure.

158. SALINAS was convulsing for several minutes and urinated on herself while having a seizure.

159. Once SALINAS regained consciousness, she saw officers throwing tear gas grenades at inmates and officers threw tear gas grenades directly at her, in violation of CDCR rules.

160. ARROYO ordered subordinate officers to pepper spray and tear gas SALINAS even though she was completely defenseless and posed no threat to anyone.

161. SALINAS was eventually dragged in zip ties from the cafeteria to the grass area. Officers continued to pepper spray and throw tear gas grenades at her and the other female inmates outside even though she was in zip ties and restrained.

162. SALINAS was conscious for a short period on the grass but began having another seizure. The other female inmates in the grass area began yelling "medical emergency!"

163. Sergeant Lopez (male) and Sergeant Lopez (female) were both outside on the grass area using pepper spray against the restrained female inmates, including SALINAS. This was occurring at ARROYO's direction and command. These Sergeants will be added as defendants once their full names are discovered.

164. Officer BECERRA was also at the grass area with the restrained inmates and was throwing tear gas grenades and using pepper spray. Officer BECERRA sprayed SALINAS with pepper spray while restrained and posing no threat to any officer. ARROYO ordered BECERRA to spray SALINAS with pepper spray even though she was complying with all orders.

165. SALINAS regained consciousness at the medical ward in the prison on a gurney. SALINAS had a golf-ball sized lump on her forehead and numerous bruises, abrasions and other soft tissue injuries. SALINAS was also having extreme difficulty breathing as she suffers from asthma and had inhaled pepper spray and tear gas.

166. SALINAS was transported from the prison to Mercy Medical Center in Madera for evaluation and treatment. During transport, she frequently passed out due to being in severe pain. SALINAS had not been decontaminated prior to transport, was still covered in urine and had no shoes or

19

socks.  Medical providers diagnosed SALINAS with a traumatic brain injury.

167.    SALINAS was later contacted by individuals from the Office of the Ombudsman, who apologized for what happened that day and for her despicable treatment at the hands of ARROYO and the other officers.

### WISDOM MUHAMMAD

168.    WISDOM MUHAMMAD ("MUHAMMAD") was housed in Delta Yard and taken to the cafeteria on August 2, 2024.

169.    MUHAMMAD heard and saw ARROYO give officers the order to turn off their body worn cameras prior to ordering the officers to use pepper spray and tear gas grenades against the female inmates who were complying with all directions and orders.

170.    MUHAMMAD suffers from severe asthma and begged the officers not to use pepper spray on her. The officers told MUHAMMAD to "Shut the fuck up!" prior to pepper spraying her.

171.    MUHAMMAD got on the floor in a prone position to show that she was not a threat. The officers sprayed her with pepper spray and threw tear gas grenades at her even though she was compliant. This occurred at ARROYO's direction and command.

172.    The entire cafeteria was filled with pepper spray and tear gas, and MUHAMMAD could not breathe. The officers wore gas masks so that they could continue their violent assault.

173.    MUHAMMAD cried and begged officers to "please handcuff me" as she hoped they would drag her out of the cafeteria. OFFICERS placed MUHAMMAD in zip ties, threw her back to the ground, and when MUHAMMAD said the zip ties were too tight, officers responded "I don't give a fuck!"

174.    MUHAMMAD was dragged outside to the grass area where the officers were still spraying pepper spray and throwing tear gas grenades at inmates in zip ties.

175.    MUHAMMAD had 4 tear gas grenades thrown directly at her while in zip ties out on the grass. These tear gas grenades were thrown at ARROYO's direction and command. One of the tear gas grenades was thrown directly at MUHAMMAD's face, and exploded right next to MUHAMMAD's face, which caused a permanent scar and black eye.

176.    MUHAMMAD hoped that she would die to end the pain and suffering that she was

experiencing at the hands of ARROYO and his officers.

177.    MUHAMMAD begged an officer to stop the violent assault and his response was "Shut up black bitch."

178.    The repeated attacks and violent use of force caused MUHAMMAD to lose consciousness twice, have seizures, and urinate on herself. MUHAMMAD eventually regained consciousness in an ambulance with blood all over her, an IV in her arm, and was unable to see out of her left eye. MUHAMMAD has not regained vision in her left eye.

179.    MUHAMMAD was taken to Mercy Medical Center in Madera and was not decontaminated prior to transport. When she arrived at Mercy, she was covered in pepper spray with her eyes and lungs still burning.

180.    MUHAMMAD has continued to experience seizures since August 2, 2024, something she had never experienced prior to August 2, 2024.

181.    MUHAMMAD has been unable to return to the cafeteria since August 2, 2024, as returning is too traumatic and triggers severe mental and emotional distress. MUHAMMAD has been forced to spend her own funds for food in order to avoid the cafeteria.

**ELAINE DE LEON GUERRERO**

182.    ELAINE DE LEON GUERRERO ("DE LEON GUERRERO") is an "Honorably Discharged" veteran from the Army who served active duty in Iraq and Kuwait.

183.    DE LEON GUERRERO was housed in 513 and taken to the cafeteria on August 2, 2024. DE LEON GUERRERO had previously been diagnosed while in custody at CCWF with asthma, severe post-traumatic stress disorder and a back injury.

184.    DE LEON GUERRERO was diagnosed with PTSD while in the Army after the truck she was riding in was hit with 14 rockets and mortar rounds. The rockets and mortar rounds killed three of her friends and seriously wounded two others. DE LEON GUERRERO was sent out afterwards to retrieve her friends' remains.

185.    On August 2, 2024, DE LEON GUERRERO was sprayed with pepper spray and had tear gas grenades thrown at her at ARROYO's direction and command.

186.    Some of the officers were yelling "Get down!" while other officers were yelling "Get up!"

21

while the violent attack was occurring, which confused the female inmates subject to the violent assault.

187. DE LEON GUERRERO was confused by the conflicting orders, was trying to comply and begging officers not to shoot her with rubber bullets and bean bag rounds.

188. DE LEON GUERRERO was prone on the ground choking on pepper spray and tear gas when an officer rolled a tear gas grenade under her body, which exploded, destroying her eyeglasses and covering her in tear gas.

189. DE LEON GEURRERO was trampled by other inmates who were trying to get away from the exploding tear gas grenades. This caused DE LEON GEURRERO's back to be re-injured.

190. Someone opened a door to an outside area, and DE LEON GUERRERO attempted to exit the cafeteria. Officers immediately yelled "Close the door!" to keep the inmates in the cafeteria and to continue their violent assault.

191. Once DE LEON GUERRERO was removed from the cafeteria in zip ties, she was taken to the grass area and was sprayed with pepper spray and subjected to tear gas grenades again. ARROYO was outside and was directing the officers to continue their attack on the restrained women, including DE LEON GUERRERO.

192. DE LEON GUERRERO was pepper sprayed repeatedly, forced to inhale tear gas, had her back re-injured by officers while they were assaulting her, and sustained injuries to her chest and head.

193. ARROYO prevented DE LEON GUERRERO from getting urgent medical treatment by ordering medical providers to "stay back" and allowing the officers to continue their criminal acts.

194. DE LEON GUERRERO witnessed officers so disgusted by ARROYO and MENDOZA's violent attack on the compliant women that they just walked away and refused to participate anymore.

195. CCWF has denied DE LEON GUERRERO's requests for mental health treatment after being violently assaulted by officers.

196. DE LEON GUERRERO has been unable to return to the cafeteria since August 2, 2024, as it triggers her severe PTSD. DE LEON GUERRERO has put in for a medical accommodation to have her trays delivered to her cell, but her accommodation request was denied on the grounds that she has had PTSD for over a decade.

197. DE LEON GUERRERO was informed on August 2, 2024, after the incident, that her

22

mother passed away that day.

**SHANNON GUTIERREZ**

198.    SHANNON GUTIERREZ ("GUTIERREZ") was housed in 513 and taken to the cafeteria on August 2, 2024. GUTIERREZ is mobility impaired after having suffered a prior back injury and had been provided a wheelchair by medical providers for use during her confinement at CCWF. GUTIERREZ was confined to the wheelchair on August 2, 2024.

199.    GUTIERREZ informed the officers surrounding her in the cafeteria that she was disabled and could not get on the ground, and their response was "I don't give a fuck, get on the ground!" GUTIERREZ painfully exited the wheelchair and sat on the ground to comply with the orders.

200.    After she sat on the floor, officers sprayed her with pepper spray and threw tear gas grenades at her. ARROYO commanded officers to use force against GUTIERREZ even though she was compliant.

201.    GUTIERREZ struggled to get away from the tear gas grenades exploding right next to her. MENDOZA, seeing that GUTIERREZ was crawling away from the tear gas grenades, ordered officers to shoot her with rubber bullets, and empty entire cans of pepper spray on her in her new location.

202.    GUTIERREZ was covered from head to toe in pepper spray, multiple tear gas grenades exploded on and around her, and was covered in bruises, scrapes, and cuts. GUTIERREZ was also shot with rubber bullets even though she was compliant with all orders.

**TANESHA RANDOLPH**

203.    TANESHA RANDOLPH ("RANDOLPH") was housed in 513 and taken to the cafeteria on August 2, 2024.

204.    RANDOLPH was sprayed with pepper spray and had tear gas grenades thrown at her at ARROYO's direction and command while in the cafeteria.

205.    RANDOLPH was complying with all orders and commands at the time that she was violently attacked.

206.    RANDOLPH attempted to get away from the exploding tear gas grenades but officers shut and locked a door that she had hoped to use to exit the cafeteria. ARROYO ordered officers to close and

23

lock the door.

207. ARROYO also ordered the officers to "Shoot!" and "Spray!" RANDOLPH and the other inmates with pepper spray while they were complying with orders.

208. RANDOLPH lost consciousness in the cafeteria due to being pepper sprayed and having tear gas grenades exploding on and around her.

209. After RANDOLPH lost consciousness, she began having seizures and convulsions, and her cellmate attempted to drag her to safety for fear of her being trampled by inmates and/or officers.

210. RANDOLPH was covered in bruises, scrapes and abrasions after the incident.

211. When RANDOLPH regained consciousness, she begged officers to cuff her and remove her from the cafeteria.

212. RANDOLPH was removed from the cafeteria in zip ties and taken to the grass area outside.

213. RANDOLPH was not decontaminated and was not provided any medical assistance for her injuries, which included scrapes and abrasions to her knees and being covered in pepper spray and tear gas.

214. After the assault ended, RANDOLPH was informed it was a "Training Day" and that they were using the violent assault to train officers on the use of force.

215. Medical staff were stationed nearby and several were trying to approach RANDOLPH and the other female inmates that were having seizures and convulsing due to the use of pepper spray and tear gas. ARROYO ordered the medical providers to stay back and not assist any of the female inmates, including RANDOLPH, having serious medical issues.

216. Several of the medical staff were crying based on what they were witnessing at the hands of ARROYO and his officers and their inability to help.

217. ARROYO personally intervened and prevented PLAINTIFFS, including RANDOLPH, from receiving timely and necessary medical care.

**REINA REYES**

218. REINA REYES ("REYES") was housed in 513 and taken to the cafeteria on August 2, 2024.

24

219. REYES witnessed ARROYO throw the first tear gas grenade at the compliant group of female inmates huddled in the cafeteria.

220. REYES had previously been diagnosed with severe asthma and COPD and had previous severe asthma attacks when no chemical agents were present.

221. REYES's cellmate was present in the cafeteria and knew her prior medical diagnoses included severe asthma and COPD. REYES's cellmate attempted to shield her from the use of pepper spray and tear gas by giving her a T-shirt to wrap around her face.

222. REYES could not breathe because of the use of pepper spray and tear gas grenades and thought she was going to die.

223. REYES was repeatedly sprayed with pepper spray and had tear gas grenades thrown at her, at ARROYO's directions and orders.

224. REYES went into respiratory distress and she lost consciousness.

225. REYES was eventually handcuffed and dragged outside to the grass area outside of the cafeteria while still unconscious.

226. REYES was foaming at the mouth and remembers hearing someone yelling "She is not breathing, she is not breathing!" An inmate tried to put something under her head as she foamed at the mouth so that her airway was not obstructed.

227. Eventually, she was thrown into a wheelchair with her hands still handcuffed behind her back, which only exacerbated her respiratory difficulties.

228. REYES regained consciousness in 701, the medical unit, while completely covered in pepper spray, tear gas, and was connected to a respiratory device to monitor her breathing and provide supplemental oxygen.

229. REYES suffered another asthma attack while undergoing treatment in 701 and again thought she would die.

230. A nurse informed her that she should not go to an outside facility for treatment as officers would retaliate for seeking outside medical care.

231. REYES subsequently had an allergic reaction to the chemical agents which caused an infection in her lungs requiring additional medications and hospitalization.

25

232. It took several weeks for the bruises and abrasions covering her body to fully heal.

**AMILIA MANZANO**

233. AMILIA MANZANO housed in Delta Yard and was taken to the cafeteria on August 2, 2024.

234. MANZANO was subjected to pepper spray and tear gas by officers in the cafeteria. MANZANO saw ARROYO giving the officer's orders to pepper spray and tear gas her even though she was complying with all of the officer's orders.

235. MANZANO saw ARROYO pointing at other compliant female inmates and ordering the officers to pepper spray and throw tear gas grenades at them.

236. MANZANO saw and heard ARROYO order officers to beat WIND and CAMERON with batons even though they were compliant.

237. MANZANO saw FELIX and RAMOLETE use their entire pepper spray canisters against CAMERON and WIND even though they begged for officers not to pepper spray them due to CAMERON having severe asthma and a pacemaker.

238. According to MANZANO, officers "beat the shit out of WIND" with batons at ARROYO's command.

239. MANZANO was prone on the ground and was trampled by inmates and officers during the chaos caused by ARROYO's assault on peaceful inmates. MANZANO was kicked in the head during the chaos, causing a permanent lump on her forehead.

240. MANZANO had a seizure from the tear gas and pepper spray, fainted and lost consciousness, and her cellmates were calling for officers to assist with MANZANO's medical emergency. ARROYO ordered medical providers to stay back and not render aid.

241. MANZANO was transported out of the prison to a hospital in Madera the night of August 2, 2024, where medical providers diagnosed her with a concussion.

242. MANZANO continued to vomit for 24 hours after the incident, requiring CDCR to send her back to the hospital for evaluation and treatment of a traumatic brain injury.

243. MANZANO's body was covered in bruises, scrapes and contusions after the incident.

**NICOLE MILAN**

26

244.    NICOLE MILAN ("MILAN") was ordered to go to the cafeteria on August 2, 2024.

245.    In the cafeteria, MILAN saw ARROYO giving orders to his subordinate officers to pepper spray and throw tear gas grenades at female inmates, including PLAINTIFFS, that were complying with officers' orders and verbal commands.

246.    MILAN was subjected to both pepper spray and tear gas grenades at ARROYO's direction, even though she was sitting down and complying with all orders. The tear gas and pepper spray in the cafeteria made it impossible for MILAN to see and breathe.

247.    MILAN had previously been diagnosed with carpal tunnel syndrome while in custody at CCWF and this condition causes pain, numbness, tingling and weakness in her hands and wrists.

248.    MILAN had also been previously diagnosed with Raynaud's phenomenon while at CCWF which is a condition that causes blood vessels in her fingers to narrow in response to emotional distress, causing extreme pain, sores and in extended cases can lead to gangrene.

249.    After being subjected to pepper spray and tear gas at ARROYO's direction even though she was complying with all orders and commands, unknown custodial officers placed zip ties so tightly on her wrists that her hands became swollen and turned purple. The zip ties were so tight that they cut into MILAN's wrists and left permanent scars.

250.    MILAN informed the officers of her prior diagnoses for carpal tunnel syndrome and Raynaud's Phenomenon and begged officers to loosen the zip ties but was ignored.

251.    Placing excessively tight zip ties on MILAN aggravated MILAN's pre-existing medical conditions and has caused permanent injury to her fingers and wrists.

252.    MILAN pleaded with custodial staff for medical treatment after the zip ties were removed. Officers denied her the right to complete a timely CDCR 7219 examination. This denial came from ARROYO who had ordered medical providers to "stay back" and not treat the injured inmates.

253.    MILAN continues to experience daily mental and emotional distress after being subjected to excessive and unnecessary force by ARROYO and the officers under his command.

254.    MILAN has frequent nightmares about the incident and it is very difficult for her to return to the cafeteria as she now suffers from PTSD.

**POST AUGUST 2, 2024**

27

255. For a five-day period after August 2, 2024, all of the women in 513 were ordered locked in their cells with no privileges.

256. Once lockdown ended, CDCR offered the female inmates mental health counseling in order to help them recover but required that the female inmates go to the cafeteria for counseling.

256. ARROYO, MENDOZA, FELIX, RAMOLETE and others tried to cover-up their criminal acts by issuing Rules Violation Reports ("RVRs" or "115s) against the victims of their crimes.

257. The RVRs were issued to inmates that underwent a CDCR 7219 examination after having been injured and were meant to exonerate the officers by painting the victims as the aggressors. This was another act by the "Delta Dogs" in furtherance of their conspiracy to retaliate and keep inmates silent about officer misconduct and criminal acts.

258. WIND and CAMERON were issued 115s alleging that they were "obstructing a peace officer" in violation of CDCR rules. The 115s to WIND and CAMERON were issued by RAMOLETE. They were found "Not Guilty" after their disciplinary hearings.

259. Even though CDCR found WIND "Not Guilty" after hearing, ARROYO made sure she was given punishment, including 120 days of A1 status (no canteen, no mail, phone and day room losses, and no yard time). ARROYO also eliminated 60 days of good time credit and extended WIND's release date.

260. The Office of Internal Affairs ("OIA") from Sacramento came to CCWF and informed WIND and CAMERON that a "grievous error" had been committed against them.

261. OIA informed WIND and CAMERON that CCWF would not allow OIA to see the video camera footage taken from August 2, 2024, "because it was so horrendous."

262. WIND had previously observed video of her and CAMERON being assaulted, pepper-sprayed and tear-gassed during her RVR hearing.

263. YANCEY was issued a 115 for "obstructing/assaulting a peace officer". YANCEY plead "Not Guilty" and asked for all evidence relating to the charges.

264. CCWF informed YANCEY that 'the cameras were not working" and she was found not guilty of the alleged rules violation.

265. YANCEY met with a woman from the Ombudsman Office from Sacramento who

conveyed that they disagreed with ARROYO's handling of August 2, 2024, and apologized for her mistreatment at the hands of ARROYO.

266.    Captain Castillo and Lieutenant Quintero also apologized to YANCEY and said that what happened to her "should have never happened."

267.    CLARK was issued a 115 for "obstructing a peace officer." Two Lieutenants were present at her RVR hearing from Valley State Prison ("VSP"). Lieutenant Salas from VSP told her that her rights had been violated, and she was found "Not Guilty" at her hearing.

268.    MONROE was issued a 115 for being "Involved in a Riot." The 115 was dismissed by CDCR as CDCR said they had no video of MONROE being involved in any riot. Even though the 115 was dismissed, the 115 bars MONROE from changing housing assignments, and provides a target to other officers that MONROE was involved in August 2, 2024.

269.    SALINAS was given a 115 for "Obstructing a Peace Officer." SALINAS was found "Not Guilty" after hearing.

270.    REYES was issued a 115 for "disobeying an officer's orders." REINA REYES was found "Not Guilty" after her disciplinary hearing.

271.    PLAINTIFFS filed 602 grievances against ARROYO, MENDOZA and the other unknown correctional officers that violently attacked them on August 2, 2024.

272.    CDCR has not issued any discipline against ARROYO, MENDOZA, FELIX, BECERRA, RAMOLETE, ABREGO or any of the officers involved. ARROYO and BECERRA were simply transferred to another prison to continue their abuse and mistreatment of inmates.

273.    On August 21, 2024, Warden DE LA CRUZ held a "Trauma Event" to talk about August 2, 2024, with all of the women housed in 513. This occurred from 9:45 to 11:45 a.m. The flyer for this event stated the event was to "Release and Heal" and was advertised as a day to come together and recover from any trauma that occurred on August 2, 2024.

274.    DE LA CRUZ informed the inmates at the meeting that she was one of the individuals who orchestrated August 2, 2024, and refused to provide any inmates with any information as to the unlawful and unconstitutional uses of force that occurred. DE LA CRUZ did not apologize to the women victimized by ARROYO and the other officers.

29

275.  DE LA CRUZ did inform inmates at the meeting that what happened "was wrong," but it would not be in her "best legal interests" to discuss the mistreatment of inmates or misconduct committed by her staff on August 2, 2024.

276.  Captain Williams spoke at the meeting and said that inmates "need to stop talking about what happened as it was in the past" and "move on to determine what we are going to do better for the future." Approximately 50 percent of the inmates attending abruptly got up and walked out during Captain Williams attempts to whitewash the violence inflicted by ARROYO and the other officers.

277.  Approximately 6 months after ARROYO, MENDOZA, RAMOLETE, FELIX, BECERRA, ABREGO and others committed criminal acts against 159 female inmates, the Warden still cannot admit that custodial staff did anything wrong.

278.  At CCWF, in the "Program Office" at D Program, the custodial officers at CCWF have put up a picture of ARROYO and above the picture it says, "SAVE A LIFE, BRING BACK ARROYO!."

279.  DE LA CRUZ clearly does not care about the callous message this sign sends to the inmates still housed at CCWF who had their constitutional rights violated by ARROYO and who are still suffering from being violently attacked by 60 to 70 officers.

280.  DE LA CRUZ locked down all of 513 for several days after August 2, 2024, and restricted or cut off all tablet use, yard time, and inmate shopping, even though she knew that inmates had their rights violated.

281.  No criminal charges have been brought against ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO or the other custodial officers, even though there is video evidence that proves they violated PLAINTIFFS' constitutional rights and the California Penal Code.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### "Retaliation"

### (42 U.S.C. § 1983)

*Against Defendants DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE and DOES 1 to 60*

282.  PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 281, as though

30

fully set forth herein.

283.    Defendants DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE and DOES 1 to 60 deprived PLAINTIFFS of their rights under the First Amendment to the U.S. Constitution, when they retaliated against PLAINTIFFS for the filing of lawsuits and PREA complaints against officers who had committed "Staff Sexual Misconduct" against inmates.

284.    PLAINTIFFS, and all of the other inmates in 513, were engaged in protected conduct and had the right under CDCR's rules and regulations to file lawsuits, PREA complaints, prison grievances and pursue redress against officers that had violated their constitutional rights under the Eighth Amendment by committing sexual assault.

285.    Defendants DE LA CRUZ, ARROYO, MENDOZA and RAMOLETE and DOES 1-60 took adverse actions against PLAINTIFFS in the form of unlawful cell searches, placing all of 513 on "PSR" and "First Watch," and subjecting the inmates to cruel and unusual punishment, prohibited by the Eighth Amendment, because of the protected conduct.

286.    Defendants ARROYO and RAMOLETE also filed false RVR's or 115's to retaliate against CAMERON, WIND and other inmates after their violent and unconstitutional uses of force.

287.    The adverse actions taken by Defendants DE LA CRUZ, ARROYO, MENDOZA and RAMOLETE chilled PLAINTIFFS' exercise of their First Amendment rights and advanced no legitimate correctional goals. The Defendants' actions were arbitrary and capricious and unnecessary to the maintenance of order in the institution.

288.    As a direct and proximate result of said acts by Defendants DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress, costs and attorneys' fees.

289.    Defendants DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE and DOES 1 to 60 acts constituted oppression, fraud and/or malice thereby entitling Plaintiff to an award of exemplary and punitive damages against Defendants DE LA CRUZ, ARROYO, MENDOZA and RAMOLETE according to proof.

## SECOND CLAIM FOR RELIEF

### "Cruel and Unusual Punishment"

### (42 U.S.C. § 1983)

*Against ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

290. PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 289, as though fully set forth herein.

291. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 deprived PLAINTIFFS of their rights under the Eighth Amendment to be free from "cruel and unusual punishments." These claims include liability for directly inflicting cruel and unusual punishment as well as under a failure to intervene theory to stop the use of excessive force committed directly in their presence by other officers.

292. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 used excessive and unnecessary force under the circumstances as no PLAINTIFF had engaged in any activity that violated CDCR rules or that placed any officer in threat of harm or injury prior to the use of force.

293. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 acted maliciously and sadistically for the purpose of causing harm and not in a good faith effort to restore or maintain discipline.

294. The acts of Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 caused harm to PLAINTIFFS, as detailed above.

295. As a direct and proximate result of said acts by Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress, costs and attorneys' fees.

296. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendants ARROYO, MENDOZA, FELIX,

32

RAMOLETE, BECERRA, ABREGO and DOES 1-60 according to proof.

### THIRD CLAIM FOR RELIEF

#### "Failure to Protect"

#### (42 U.S.C. § 1983)

*Against DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO*

*and DOES 1 to 60*

297.    PLAINTIFFS re-allege and incorporates by reference paragraphs 1 through 296, as though fully set forth herein.

298.    The aforementioned acts and/or omissions of DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 in failing to properly protect PLAINTIFFS from retaliation and cruel and unusual punishment deprived PLAINTIFFS of their rights under the U.S. Constitution. These acts and the failure to act to protect PLAINTIFFS were done with clear disregard for PLAINTIFFS' rights under the Eighth Amendment.

299.    DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 made intentional decisions with respect to the conditions under which PLAINTIFFS were confined, which put PLAINTIFFS at risk of suffering serious harm, and did not take reasonable measures to avoid the risks.

300.    DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO, DOES 1 to 60 and other supervisory and correctional officers employed at CCWF failed to protect PLAINTIFFS from being retaliated against for the filing of PREA complaints by inmates in their housing unit, and failed to protect PLAINTIFFS from being subjected to the use of unnecessary and excessive force.

301.    DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 observed and received information that that would lead any reasonable person to believe searching every cell in 513 based on the filing of PREA complaints alleging staff sexual misconduct was unlawful, and that using pepper spray, tear gas grenades and the use of rubber bullets was unlawful, excessive and cruel and unusual punishment on compliant inmates that posed no threat to any officer or inmate. These decisions and conditions put PLAINTIFFS at substantial risk of suffering

33

serious harm and PLAINTIFFS in fact suffered serious harm.

302. Defendants did not take reasonable available measures to abate the risk, even though a reasonable individual in the circumstances would have appreciated the high degree of risk involved in light of the obvious consequences.

303. By not taking such measures, Defendants DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and DOES 1 to 60 caused PLAINTIFFS' injuries.

304. As a direct and proximate result of said acts and/or omissions by Defendants DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical care, past and future pain and suffering, past and future mental and emotional distress, costs and attorneys' fees.

305. The aforementioned acts and/or omissions of said individual Defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of PLAINTIFFS, thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according to proof.

### FOURTH CLAIM FOR RELIEF

**"Deliberate Indifference to Serious Medical Needs"**

**(42 U.S.C. § 1983)**

*Against ARROYO and DOES 1-60*

306. PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 305, as though fully set forth herein.

307. PLAINTIFFS, a group of inmates with severe pre-existing medical diagnoses, faced serious medical needs after being subjected to repeated and prolonged exposure to pepper spray, tear gas, the explosions caused by tear gas grenades, rubber bullets, and the use of excessive and unnecessary force (strikes, kicks, punches and control holds).

308. Defendant ARROYO was deliberately indifferent to PLAINTIFFS' medical needs as he saw PLAINTIFFS having seizures, foaming at the mouth, having convulsions, urinating on themselves and suffering from severe asthma attacks and respiratory arrest.

34

309. Defendant ARROYO knew PLAINTIFFS were experiencing extreme pain from the violent attack by correctional officers as PLAINTIFFS were pleading with and begging ARROYO for medical help, and ARROYO deliberately disregarded their pleas, ordering medical providers to "Stay back!" as he ordered officers to continue the attack.

310. The acts of ARROYO, in refusing to allow medical providers to examine and treat PLAINTIFFS, caused harm to PLAINTIFFS.

311. ARROYO made the conscious decision to delay and refuse to provide treatment so that he could inflict more pain and suffering on PLAINTIFFS and send the message that PREA complaints should not be filed at CCWF.

312. As a direct and proximate result of said acts and/or omissions by ARROYO and DOES 1 to 60, PLAINTIFFS suffered injuries and damage as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical care, past and future pain and suffering, past and future mental and emotional distress, costs and attorneys' fees

313. The aforementioned acts and/or omissions of ARROYO were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of PLAINTIFFS, thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according to proof.

## FIFTH CLAIM FOR RELIEF

### "Supervisory Liability"

### (42 U.S.C. § 1983)

*AGAINST DE LA CRUZ, ARROYO, MENDOZA, FELIX and DOES 1 to 60*

314. PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 313, as though fully set forth herein.

315. Supervisory Defendants DE LA CRUZ, ARROYO, MENDOZA, FELIX and DOES 1 to 60 were acting under color of state law during all times relevant to this action.

316. By incarcerating PLAINTIFFS and other female inmates and assuming custody and control over PLAINTIFFS, DE LA CRUZ, ARROYO, MENDOZA, FELIX (the "Supervisory Defendants") created a special relationship that required the Supervisory Defendants to assume affirmative duties of care and protection.

317. The Supervisory Defendants and DOES 1 to 60 acted recklessly and with conscious disregard of known and obvious risks to PLAINTIFFS' safety, failed to protect PLAINTIFFS and other female inmates from retaliation, and cruel and unusual punishment by correctional officers at CCWF in the following ways:

a. Failing to enforce CDCR's rules and regulations regarding the prohibition against retaliation for the filing of PREA complaints;

b. Failing to prohibit the use of cruel and unusual punishment through the use of chemical agents (pepper spray and tear gas) against complaint inmates that posed no threat to any officer or inmate in violation of CDCR rules;

c. Failing to prohibit the use of tear gas grenades as explosive devices intended to cause injury by allowing officers to throw them directly at inmates in violation of CDCR rules;

d. Failing to prohibit the use of impact weapons, such as guns that fire rubber bullets, at inmates that are complying with officer's orders;

e. Failing to investigate and discipline officers who commit retaliation for the filing of PREA complaints, who use excessive force and who write false 115 reports to cover-up and conceal their misconduct after engaging in unlawful activity;

318. This conduct amounts to deliberate indifference to the rights of PLAINTIFFS and other female inmates and shocks the conscience.

319. The Supervisory Defendants set in motion the acts causing harm to PLAINTIFFS by approving retaliatory measures, knew that correctional officers were engaging in these acts and knew the conduct would deprive PLAINTIFFS and others of their rights.

320. As a direct and proximate result of said acts and/or omissions by the Supervisory Defendants and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and as to which PLAINTIFFS are entitled to recover damages for past and future medical care, past and future pain and suffering, past and future mental and emotional distress, costs and attorneys' fees.

321. The aforementioned acts and/or omissions of the Supervisory Defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of PLAINTIFFS, thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according

36

to proof.

## SIXTH CLAIM FOR RELIEF

### "California Gender Violence Law"

### (Cal. Civ. Code § 52.4)

*Against STATE OF CA, CDCR, ARROYO, MENDOZA, RAMOLETE, BECERRA, ABREGO*

*and DOES 1 to 60*

322.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 321, as though fully set forth herein.

323.    The actions of ARROYO, MENDOZA, RAMOLETE, BECERRA and ABREGO, in ordering other officers to commit acts of violence or themselves committing acts of violence constitute "gender violence" and sex discrimination under Civil Code § 52.4, as those acts constitute criminal offenses under state law and involved physical invasions of their bodily integrity under coercive conditions, whether or not ARROYO, MENDOZA, RAMOLETE, BECERRA and ABREGO are ever charged for their criminal conduct.

324.    ARROYO, MENDOZA, RAMOLETE, BECERRA and ABREGO engaged in the use of excessive force against compliant female inmates that included the use of pepper spray, tear gas grenades, rubber bullets and physical acts of assault and battery on multiple occasions for several hours. ARROYO, MENDOZA, RAMOLETE, BECERRA and ABREGO performed these acts for the purpose of injuring, humiliating, degrading and demeaning PLAINTIFFS and to retaliate against them for the inmates' lawful use of a grievance procedure while in custody.

325.    As a direct and proximate result of said acts by Defendants and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress, costs and attorneys' fees.

326.    Defendant ARROYO, MENDOZA, RAMOLETE, BECERRA and ABREGO's acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendants according to proof.

327.    Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the

37

principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

### SEVENTH CLAIM FOR RELIEF

### "Tom Bane Civil Rights Act"

### (California Civil Code § 52.1)

*Against STATE OF CA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE,*

*BECERRA and ABREGO and DOES 1 to 60*

328.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 327, as though fully set forth herein.

329.    Defendants DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO engaged in acts of retaliation, cruel and unusual punishment, failed to protect inmates under their care and custody, failed to supervise their officers and others under their command and authority and engaged in acts of Gender Violence prohibited by Cal. Civil Code § 52.4, on multiple occasions, through the use of threats, intimidation and coercion, and with deliberate indifference or reckless disregard of rights protected by the First, Eighth and Fourteenth Amendments to the U.S. Constitution, as well as California Constitution, Article I, § 17 and California Civil Code § 52.4.

330.    Defendants DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABRGO and DOES 1 to 60 failed to intercede in these acts of retaliation, cruel and unusual punishment, and the failure to protect inmates under their care and custody, with deliberate indifference or reckless disregard of rights protected by the First, Eighth and Fourteenth Amendments to the U.S. Constitution as well as California Constitution Article I, § 17 and California Civil Code § 52.4.

331.    Defendants STATE OF CALIFORNIA and CDCR failed to train its custodial officers in the recognition and prevention of retaliation for the filing of PREA complaints alleging staff sexual misconduct as required by Department of Corrections and Rehabilitation Operations Manual, Article 44, Section 54040.7 "Detection, Notification and Reporting," California Code of Regulations, Title 15, Section 3401.5(c), and the Sexual Abuse in Detention Act ("SADEA") ( See Penal Code Sections 2635-2643).

332.    Defendants STATE OF CALIFORNIA and CDCR have policies, customs and practices that permit employees to retaliate for the filing of PREA complaints, and that allows correctional officers to use excessive and unnecessary force, including the use of chemical agents and impact weapons on compliant and non-assaultive inmates, even though there was a known and obvious risk of inmates having their constitutional and statutory rights violated.

333.    Defendants STATE OF CALIFORNIA and CDCR, acting or purporting to act under color of state law and as policymaking authorities, maintained policies or customs of action and inaction resulting in harm to PLAINTIFFS, with deliberate indifference or reckless disregard of rights protected by the Eighth and Fourteenth Amendments to the U.S. Constitution as well as California Constitution Article I, § 17 and California Civil Code § 52.4.

334.    PLAINTIFFS were harmed by Defendants' actions and omissions and their conduct was a substantial factor in causing PLAINTIFFS' harm

335.    DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO's actions constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according to proof.

336.    Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

337.    PLAINTIFFS were injured as a direct and proximate result of Defendants' actions and inactions, entitling them to receive compensatory and treble damages and civil penalties against Defendants as allowed by law.

338.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs pursuant to Civil Code Section 52.1 and as allowed by law.

## EIGHTH CLAIM FOR RELIEF

### "Assault and Battery"

### (California Common Law)

*Against STATE OF CA, CDCR, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA,*

39

*ABREGO and DOES 1 to 60*

339.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 338, as though fully set forth herein.

340.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO acted with the intent to cause a harmful or offensive contact by repeatedly using excessive and unnecessary force sexually against PLAINTIFFS while they were under Defendants' care, custody and control as inmates at CCWF.

341.     Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO caused an imminent fear of assault and battery by repeatedly using pepper spray, tear gas, rubber bullets and punches, kicks and baton strikes, even though there was no lawful or legitimate reason to use any force against any of the female inmates.

342.    PLAINTIFFS knew and were aware that force was going to be used on them prior to it occurring and did not consent to being touched by Defendants and did not consent to being assaulted and battered while in custody by Defendants.

343.    PLAINTIFFS were harmed by Defendants' conduct.

345.    As a direct and proximate result of said acts by Defendants, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

346.    Defendants' acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendants according to proof.

347.    Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

**NINTH CLAIM FOR RELIEF**

**"Intentional Infliction of Emotional Distress"**

**(California State Common Law)**

40

*Against STATE OF CA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

348. PLAINTIFFS re-allege and incorporates by reference paragraphs 1 through 347, as though fully set forth herein.

349. Defendants engaged in extreme and outrageous conduct by repeatedly subjecting PLAINTIFFS to retaliation, cruel and unusual punishment, excessive force, assault and battery, among other civil and criminal wrongs, which caused PLAINTIFFS to suffer severe mental and emotional distress.

350. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 engaged in extreme and outrageous conduct, including failing to protect PLAINTIFFS and other female inmates from unlawful and unconstitutional uses of force and acted with reckless disregard for the obvious consequences of their actions.

351. Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 actions and inactions constituted oppression, fraud and/or malice resulting in great harm and thereby entitling PLAINTIFFS to an award of punitive damages against all individually named Defendants.

352. PLAINTIFFS were injured as a direct and proximate result of Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 actions and inactions, entitling PLAINTIFFS to receive compensatory damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

353. Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

## TENTH CLAIM FOR RELIEF

**"Failure to Summon Medical Care"**

**(California Civil Code Section 845.6)**

*Against STATE OF CA, CDCR, ARROYO and DOES 1-60.*

41

354. PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 353, as though fully set forth herein.

355. ARROYO and DOES 1 to 60 knew that PLAINTIFFS required immediate medical care as he saw PLAINTIFFS going into respiratory arrest, saw PLAINTIFFS foaming at the mouth and passing out, saw PLAINTIFFS urinating on themselves and vomiting while unconscious, and saw PLAINTIFFS being injured by the use of unlawful and unnecessary force. ARROYO also knew PLAINTIFFS had pre-existing medical conditions, and some had previously been diagnosed with having a stroke, suffering from asthma or PTSD, or been confined to a wheelchair, and saw these PLAINTIFFS being covered head to toe in pepper spray and tear gas.

356. Medical providers saw PLAINTIFFS suffering from severe injuries and medical problems, and begged ARROYO to please allow them to treat PLAINTIFFS, and ARROYO refused to allow the medical providers to provide aid and medical care as needed.

357. Medical providers stationed at the scene of the attack by ARROYO were crying based on seeing ARROYO inflict pain and injury on PLAINTIFFS even though PLAINTIFFS were complying with all orders.

358. Medical providers were crying because ARROYO denied them the ability to come to the aid of PLAINTIFFS and knew that they required immediate medical care.

359. ARROYO knew that all of the PLAINTIFFS were in need of immediate medical care and denied that care so that he could continue his unlawful and violent attack against PLAINTIFFS.

360. Defendants ARROYO and DOES 1 to 60 actions and inactions constituted oppression, fraud and/or malice resulting in great harm and thereby entitling PLAINTIFFS to an award of punitive damages against ARROYO.

361. PLAINTIFFS were injured as a direct and proximate result of ARROYO and DOES 1 to 60 actions and inactions, entitling PLAINTIFFS to receive compensatory damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

362. Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries

42

proximately caused by the acts and omissions of their employees acting within the scope of their employment.

## ELEVENTH CLAIM FOR RELIEF

### "Negligence"

### (California State Common Law)

*Against STATE OF CALIFORNIA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

363.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 162, as though fully set forth herein.

364.    Defendants STATE OF CALIFORNIA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 owed a duty to protect PLAINTIFFS and breached that duty by allowing ARROYO to use and order others to use excessive and unnecessary force against PLAINTIFFS while housed at CCWF.

365.    Defendants STATE OF CALIFORNIA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 failed to ensure PLAINTIFFS were free from retaliation and could submit grievances and PREA complaints without being subjected to unlawful searches and violence.

366.    Defendants STATE OF CALIFORNIA, CDCR, DE LA CRUZ, ARROYO, MENDOZA, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 failed to summon emergency medical care to PLAINTIFFS even though they knew PLAINTIFFS required and were in need of urgent medical care.

367.    PLAINTIFFS were injured as a direct and proximate result of Defendants' actions to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

368.    Defendants STATE OF CALIFORNIA and CDCR are vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

## PRAYER FOR RELIEF

43

WHEREFORE, PLAINTIFFS seeks judgment as follows:

1. For an award of nominal, compensatory, general and special damages against Defendants according to proof at trial;

2. For an award of exemplary/punitive damages against the individual Defendants and DOES 1 to 60, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional or statutory rights, and constituted oppression, fraud or malice resulting in great harm;

3. For an award of actual damages, treble damages, civil penalties and any other available relief against Defendants as allowed by law;

4. For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, Cal. Civ. Code § 52.1, Cal. Civ. Code § 52.4, Cal Code of Civ. Proc. § 1021.5, and any other statute that may be applicable; and

5. For an award of any other relief, as the Court deems fair, just and equitable.

Dated: March 3, 2025                              Respectfully Submitted,


By: */s/ Robert Chalfant*_____
    Robert Chalfant
    ROBERT CHALFANT LAW, PC
    Attorney for Plaintiffs


### I.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 3, 2025                              Respectfully Submitted,


By: */s/ Robert Chalfant*_____
    Robert Chalfant
    ROBERT CHALFANT LAW, PC
    Attorney for Plaintiffs

**COMPLAINT; DEMAND FOR JURY TRIAL**
*Wind v. State of California, et al*, United States District Court, Eastern District of California