1  Robert Chalfant (State Bar No. 203051)
2  ROBERT CHALFANT LAW, PC
   13620 Lincoln Way, Suite 325
3  Auburn, CA 95603
   Telephone:    (916) 647-7728
4  Facsimile:    (916) 930-6093
   Email:    robert@rchalfant.com
5
6    Attorney for Plaintiffs
     CHRISTINA WIND, CATRINA CAMERON,
7    JAMIE MONROE, SHANNON GUTIERREZ,
     ANNA SALINAS, WISDOM MUHAMMAD,
8    ANTOINETTE YANCEY, DONYETTE
     CLARK, ELAINE DE LEON GUERRERO,
9    TANESHA RANDOLPH, REINA REYES,
     AMILIA MANZANO and NICOLE MILAN
10
11              UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13                    FRESNO DIVISION

14  CHRISTINA WIND, CATRINA CAMERON,         Case No. 1:25-cv-00266-JLT-HBK
    ANTOINETTE YANCEY, DONYETTE CLARK,
15  JAMIE MONROE, SHANNON GUTIERREZ,
    ANNA SALINAS, WISDOM MUHAMMAD,           **FIRST AMENDED COMPLAINT FOR**
16  ELAINE DE LEON GUERRERO,                 **VIOLATION OF CIVIL AND**
    TANESHA RANDOPLH, REINA REYES,           **CONSTITUTIONAL RIGHTS**
17  AMILIA MANZANO and NICOLE MILAN,
                                             **DEMAND FOR JURY TRIAL**
18              Plaintiffs,
19        v.
20  CALIFORNIA DEPARTMENT OF
    CORRECTIONS AND REHABILITATION
21  (CDCR), ISIDRO ARROYO, C. MENDOZA,
    MICHAEL FELIX, VALERIANO RAMOLETE,
22  OFFICER BECERRA, YESSICA ABREGO and
    DOES 1 to 60,
23
24              Defendants.
25
26
27
28
                              1

**INTRODUCTION**

In the months leading up to August 2, 2024, Sergeant ISIDRO ARROYO ("ARROYO") had been growing increasingly unhappy that female prisoners at CCWF were filing lawsuits and Prison Rape Act Elimination ("PREA") complaints against officers for committing "Staff Sexual Abuse" which is defined by CDCR as "[A]ny threatened, coerced, attempted, or completed sexual contact, assault or battery between staff and offenders."

ARROYO decided that he was going to retaliate against all of the women confined in cell block 513 (also known as "D Yard" or "Delta Yard") for the filing of lawsuits and PREA complaints (159 female prisoners were housed in 513), by conducting a search of every single cell in housing unit 513 and taking away all of the female inmates' rights and privileges.

On August 2, 2024, ARROYO followed through after threats of retaliation and commenced a search of all cells in 513. All 159 female inmates in Delta Yard were removed from their cells at ARROYO's direction, taken to the cafeteria, and locked inside the building. While confined in the cafeteria, the inmates saw their personal property being thrown into the trash in violation of CDCR rules regarding the destruction of inmate property. Inmates on the Inmate Advisory Council asked to speak with ARROYO to discuss their concerns.

ARROYO responded with violence, ordering a lockdown of the entire CCWF prison and summoning all guards from CCWF and two other local prisons to respond to the cafeteria. Once at the cafeteria, ARROYO refused to speak with anyone and instead began ordering correctional officers to form a skirmish line to intimidate the female inmates. ARROYO then gave orders to use pepper spray, throw tear gas and flash bang grenades, fire rubber bullets and assault and batter the women, even though all of the female inmates were complying with officers' orders and posed no threat to any officer.

The Plaintiffs in this case sustained serious injuries from ARROYO's unlawful acts and the use of excessive force by ARROYO and the officers at his direction and command.

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction of the federal claims under 28 U.S.C. § 1331 (in that they arise under the United States Constitution) and § 1343(a)(3) (in that the action is brought to address deprivations, under color of authority, of rights, privileges, and immunities secured by the United

2

Constitution). This Court has supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are located in the Eastern District of California and because the acts and/or omissions stated herein occurred in the Eastern District of California.

3.      Intra-district venue is proper in the Fresno Division of the Eastern District of California pursuant to E.D. Cal. L.R. 120(d) because the claims asserted herein arise from acts and/or omissions which occurred in the County of Madera.

## EXHAUSTION

4.      All Plaintiffs, except AMILIA MANZANO and NICOLE MILAN, submitted timely Government Claims to the STATE OF CALIFORNIA regarding the claims alleged in this action. This action is timely filed after receiving rejection notices on several of the claims, and others being rejected under operation of law. Plaintiff AMILIA MANZANO and NICOLE MILAN are not pursuing any state law claims.

5.      All Plaintiffs timely submitted 602 Grievances, as required by CDCR rules, and have complied with all exhaustion requirements.

## PARTIES

6.      CHRISTINA WIND, CATRINA CAMERON, ANTOINETTE YANCEY, DONYETTE CLARK, JAMIE MONROE, SHANNON GUTIERREZ, ANNA SALINAS, WISDOM MUHAMMAD, ELAINE DE LEON GUERERRO, TANESHA RANDOLPH, REINA REYES, AMILIA MANZANO and NICOLE MILAN ("PLAINTIFFS") are all residents of the State of California and are all currently housed as inmates at the Central California Women's Facility, in Chowchilla, California.

7.      Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") is an agency of the State of California. Defendant CDCR is properly named as a Defendant for Plaintiff's claims under Civil Code Section 52.1 (the Bane Act).

8.      ISIDRO ARROYO is, and at all times material herein was, a Correctional Officer, holding the rank of Sergeant, employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant ISIDRO ARROYO is sued in his individual capacity.

3

**FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**
*Wind v. State of California, et al*, United States District Court, Eastern District of California

9.    Captain C. MENDOZA is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant C. MENDOZA is sued in his individual capacity.

10.    Officer VALERIANO RAMOLETE is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant VALERIANO RAMOLETE is sued in his individual capacity.

11.    Officer BECERRA is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant Officer BECERRA is sued in his individual capacity.

12.    Sergeant MICHAEL FELIX is, and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of his employment and under color of state law. Defendant MICHAEL FELIX is sued in his individual capacity.

13.    Officer YESSICA ABREGO is**,** and at all times material herein was, a Correctional Officer employed by the State of California at CCWF and acting within the course and scope of h**er** employment and under color of state law. Defendant Officer ABREGO is sued in h**er** individual capacity.

14.    Defendants DOES 1 to 60 are and/or were agents or employees of the State of California, acting within the course and scope of their employment and under color of state law. Defendants DOES 1 to 60 true and correct names and identities are not currently known. Defendants DOES 1 to 60 are sued by their fictitious names and true and correct names and identities will be submitted when ascertained.

## GENERAL ALLEGATIONS

15.    At all times relevant herein, all wrongful and unlawful acts described herein were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

16.    At all relevant times, all of the individual defendants were acting within the course and scope of their employment as correctional officers employed by the State of California and the California Department of Corrections and Rehabilitation.

4

17.     In 2006, the California Department of Corrections and Rehabilitation ("CDCR"), adopted a Prison Rape Elimination Act Policy ("PREA"), which declares that CDCR has "zero tolerance for sexual violence, staff sexual misconduct and sexual harassment in its institutions," and that all "sexual violence, staff sexual misconduct, and sexual harassment is strictly prohibited." See Department of Corrections and Rehabilitation Operations Manual ("DOM"), Article 44, Section 54040.1 "Policy".

18.     "Staff Sexual Misconduct" is defined in the PREA policy as "Any threatened, coerced, attempted, or completed sexual contact, assault or battery between staff and offenders." See "Definitions", DOM at Section 54040.3.

19.     Inmates "may report violations of [the PREA policy] to any staff member verbally or in writing, utilizing the Inmate Appeals Process, through the sexual assault hotline or through a third party." See "Detection, Notification, and Reporting" DOM at Section 54040.7.

20.     "Retaliatory measures against… offenders who report incidents of sexual violence, staff sexual misconduct or sexual harassment… shall not be tolerated and shall result in disciplinary action and/or criminal prosecution. Retaliatory measures include, but are not limited to, coercion, threats of punishment, or any other activities intended to discourage or prevent a staff or offenders from reporting the incident(s) or cooperating with investigation of an incident." See DOM, Section 54041 "Policy".

21.     Many inmates at CCWF are afraid to file PREA complaints because correctional officers employed at CCWF frequently retaliate against the inmates, and/or the inmates' claims are ignored allowing the staff sexual misconduct to continue with no repercussions.

22.     Hundreds of women have now filed lawsuits against the State of California alleging they were sexually assaulted by correctional officers employed at CCWF. Millions of dollars in damages have been paid in settlement of these claims.

### EVENTS LEADING UP TO AUGUST 2, 2024

23.     Prior to August 2, 2024, Sergeant ISIDRO ARROYO ("ARROYO") was growing increasingly unhappy that inmates were filing lawsuits and PREA complaints alleging "staff sexual misconduct" against correctional officers employed at CCWF.

24.     Prior to August 2, 2024, ARROYO had been telling inmates to stop "weaponizing" PREA and to stop filing PREA complaints against officers.

5

25.     Plaintiff ANTOINETTE YANCEY ("YANCEY"), who serves on the Inmate Advisory Council ("IAC"), had frequent interaction with ARROYO in the months leading up to August 2, 2024, due to her position on the IAC.

26.     ARROYO had been telling YANCEY that she needed to "get the inmates under control" and that "if she did not get the inmates to stop filing PREA complaints against his officers" he was going to search every cell in building 513, which houses 159 women, and throw away their property.

27.     ARROYO informed YANCEY that he would institute Program Security Restriction ("PSR"), which meant every inmate would be placed in lockdown and lose all privileges with no exceptions. This meant a form of extended punishment where all inmates would lose the ability to leave their cell, and have no canteen, family care boxes, outside or dayroom breaks, laundry, and group activities. Additionally, the inmate's property would be disposed of through mass searches.

28.     YANCEY informed ARROYO that she could not prevent inmates from filing PREA complaints against the officers who sexually assault them, and that the inmates had the right under CDCR rules to file complaints.

29.     Prior to August 2, 2024, ARROYO had also informed DONYETTE CLARK ("CLARK") that he was unhappy about inmates filing PREA complaints against officers and that if the PREA complaints did not stop he would search all of the cells on Delta Yard and people would lose their property.

30.     CLARK told ARROYO that she did not have the ability to stop anyone from filing a PREA complaint against an officer for sexual abuse and those inmates had the right to file complaints.

31.     ARROYO had also informed TANESHA RANDOLPH ("RANDOLPH"), and the other inmates housed in 513 that "If you don't stop filing PREA, this unit was going First Watch."

32.     "First Watch" meant that the inmates in 513 would have no movement at CCWF, no canteen services or programming, and would be confined to their cells for 24 hours a day, losing all privileges.

33.     PLAINTIFFS knew that ARROYO was unhappy with inmates filing lawsuits and PREA complaints. PLAINTIFFS had previously filed PREA complaints and/or knew others that had in 513 and were afraid of ARROYO's threats of retaliation and punishment.

6

34.     PLAINTIFFS were particularly afraid of ARROYO as he is the leader of the "Delta Dogs" prison gang. Captain MENDOZA, Officer RAMOLETE and Officer BECERRA are also members of the "Delta Dogs."

35.     The "Delta Dogs" are a criminal gang composed of Delta Yard custodial officers who unlawfully intimidate and harass female inmates using verbal, physical, and sexual abuse, the filing of false Rules Violations Reports ("RVRs" or "115s"), confinement in administrative segregation, and various acts of retaliation.

36.     The "Delta Dogs" practice a "Code of Silence" to conceal their misconduct. The "Delta Dogs" also falsely charge inmates with criminal violations or CDCR Rules Violations to punish innocent inmates, increase their period of confinement and eliminate housing changes or parole chances.

37.     RVR's or 115's are filed by "Delta Dogs" to cover for misconduct committed by other "Delta Dogs" members.

38.     The "Delta Dogs" know that by charging rules violations and finding innocent inmates guilty of rules violations inmates cannot obtain relief through CDCR administrative processes or the court system for the wrong and unlawful acts of officers employed at CCWF.

39.     Some of the "Delta Dogs" wear a badge or emblem of a pit bull on their prison issued uniforms to signify their inclusion in the gang and to intimidate female inmates.

40.     Instead of taking action to investigate and stop the rapists and sexual abusers employed by CDCR at CCWF, ARROYO and members of the "Delta Dogs" decided they were going to send a message to all of the female inmates in housing unit 513 that PREA complaints should not be filed, by placing all of 513 on "First Watch" and "PSR".

41.     When the staff sexual abuse of inmates did not stop and PREA complaints continued to be filed, ARROYO sought permission from Captain Castillo to retaliate and search all of the cells in 513.

42.     ARROYO informed Captain Castillo that the reason he wanted to search all of the cells was to send a message to female inmates housed in Delta Yard that PREA complaints should not be filed against officers at CCWF.

43.     Captain Castillo informed ARROYO that he could not search all of the cells in 513 as it was in violation of CDCR's PREA rules prohibiting retaliation and denied the request.

7

44.     ARROYO then sought out Captain C. MENDOZA ("MENDOZA") to see if he would grant permission to place 513 on "PSR" or "First Watch" and search every cell in 513 for the purpose of sending a message to female inmates that PREA complaints should not be filed against officers at CCWF.

45.     MENDOZA agreed with ARROYO and granted ARROYO's request to search all of the cells in 513 and go "First Watch" and/or "PSR."

46.     MENDOZA and ARROYO then met with Warden Anissa De La Cruz ("De La Cruz") and informed her of the reasons why they wanted to search all of the cells in 513.

47.     De La Cruz agreed that a search of all of the cells in 513 was warranted and authorized the search.

48.     ARROYO had summoned guards from Pleasant Valley State Prison and Valley State Prison to assist in the search. Approximately 70 guards were present to search all of the cells in Delta Yard.

### AUGUST 2, 2024

49.     After waking up the female inmates on the morning of August 2, 2024, custodial officers removed every inmate in cell block 513 (159 inmates) from their cell and ARROYO directed them to go to the cafeteria. ARROYO then had officers begin the process of searching every cell in 513.

50.     The search went on for several hours and during that time the female inmates in the cafeteria were not provided necessary medications, food, or water, even though the search continued during the scheduled times for pill call, breakfast and lunch. ARROYO and MENDOZA ordered the cafeteria workers not to feed the inmates.

51.     An unknown sergeant arrived at the cafeteria and instead of deescalating the situation, informed the female inmates that their personal property was being thrown into the trash. This Sergeant told the inmates "[T]hey are throwing your shit out" which caused the inmates to become upset.

52.     Disposing of personal property without written notice is a violation of CDCR rules and deprived the female inmates of their Due Process rights under the U.S. Constitution. CCWF Officers are required to identify property items withheld on a confiscation form and follow a process that allows the inmate to challenge the taking of property and seek its return.

8

**FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**
*Wind v. State of California, et al*, United States District Court, Eastern District of California

53.    Instead, the officers requested trash bins and were throwing away the inmates' personal property without providing any notice as to what was being discarded. The female inmates saw their belongings being wheeled by in plain view in trash carts.

54.    PLAINTIFFS were in the cafeteria and saw an inmate pass out due to the heat and having not received her medications and food that day. Inmates immediately began calling for medical assistance and an alarm was activated.

55.    After the alarm was activated, ARROYO and MENDOZA locked down the entire prison and summoned every correctional officer at CCWF to respond to the cafeteria.

56.    Once all of the officers arrived at the cafeteria, ARROYO directed the correctional officers to form a "skirmish line" around the female inmates and they began advancing in a tactical formation while the female inmates, including PLAINTIFFS, huddled in a circle and begged officers not to hurt them.

57.    ARROYO began yelling orders at the officers while the female inmates begged for medical providers to come assist the inmate who had lost consciousness. ARROYO ignored the inmates' requests to allow medical providers to treat the inmate that had a medical emergency.

58.    ARROYO ordered officers to turn off their body worn cameras and then tapped an officer on the shoulder and gave him the command to start spraying the female inmates, including all PLAINTIFFS, with pepper spray.

59.     CHRISTINA WIND, CATRINA CAMERON, ANTOINETTE YANCEY, DONYETTE CLARK, JAMIE MONROE, SHANNON GUTIERREZ, ANNA SALINAS, WISDOM MUHAMMAD, ELAINE DE LEON GUERERRO, TANESHA RANDOLPH, REINA REYES, AMILIA MANZANO and NICOLE MILAN were sprayed with pepper spray by officers at ARROYO's command and upon his order and directions.

60.    PLAINTIFFS had complied with all previous orders from officers and had not done anything that would warrant any use of force by officers prior to being sprayed with pepper spray.

61.    ARROYO then took a tear gas grenade and threw it at the compliant group of female inmates, which included all PLAINTIFFS.

62.    ARROYO then ordered all of the other officers to start throwing tear gas and flash-bang

9

grenades at the compliant group of female inmates, including PLAINTIFFS.

63.     PLAINTIFFS had not done anything that would warrant the use of tear gas or flash-bang grenades being used, and their use was expressly prohibited by CDCR rules.

64.     CDCR rules prohibit the use of tear gas and flash-bang devices as explosive devices used to cause injury. The officers were throwing tear gas and flash-bang grenades directly at the inmates so that they would explode on or near them to cause injury.

65.     PLAINTIFFS were completely covered in pepper spray as officers were emptying their entire cans of pepper spray directly into their faces at close range.

66.     Sergeant MICHAEL FELIX ("FELIX") and Officer VALERIANO RAMOLETE ("RAMOLETE") were both present and screaming at the inmates.

67.     CHRISTINA WIND ("WIND") and CATRINA CAMERON ("CAMERON") were compliant and following the officers' orders.

68.     An unknown officer ordered WIND and CAMERON to step forward and motioned with his hand.

69.     WIND and CAMERON stepped forward as ordered, and before they even took a full step, FELIX and RAMOLETE took their industrial-sized cans of pepper spray and emptied the entire contents in WIND's and CAMERON's faces at close range, even though they were following officers' direct orders.

70.     WIND begged the officers to stop spraying them with pepper spray, as she knew that CAMERON had a pacemaker and had previously been diagnosed with severe asthma, and could possibly die from being pepper-sprayed and tear-gassed.

71.     CAMERON, unable to breathe and having a severe asthma attack, fell to the ground and WIND used her own body to try to shield CAMERON from the pepper spray now being sprayed at them by FELIX, RAMOLETE and others.

72.     WIND attempted to put her T-shirt over CAMERON's face as the FELIX and RAMOLETE continued to spray them with pepper spray.

73.     ARROYO commanded officers with batons to begin beating WIND and CAMERON, and officers complied, savagely beating the two defenseless women who had complied with all previous

10

orders.

74.    WIND attempted to lay on top of CAMERON to shield CAMERON from being struck with batons, punched and kicked by officers who were now physically assaulting the injured and defenseless women.

75.    ARROYO and MENDOZA were yelling orders for the officers to continue spraying pepper spray and throwing tear gas and flash-bang grenades at the female inmates that were already down on the floor after hearing the alarm, including all PLAINTIFFS.

76.    ARROYO then took another tear gas grenade and threw it at the compliant group of women, including all PLAINTIFFS. ARROYO then ordered other officers to start throwing additional tear gas grenades at PLAINTIFFS and the officers again complied.

77.    No warnings were given by ARROYO, MENDOZA or the other officers that tear gas and flash-bang grenades and pepper spray would be used prior to their use.

78.    PLAINTIFFS had not done anything at this point that would justify or warrant any use of force. No officer had been threatened, touched, kicked or attacked by any inmate. ARROYO and MENDOZA were having officers violently assault PLAINTIFFS even though they were complying with all directions and orders.

79.    ARROYO, intent on dehumanizing the people he had sworn an oath to protect, had clearly lost his mind at this point and was simply yelling orders designed to inflict pain and suffering on female inmates who had broken no CDCR rules and who posed no threat to any officer, simply because female inmates had filed PREA complaints and lawsuits alleging staff sexual misconduct by male officers.

80.    The other officers present, including a Lieutenant, Sergeant FELIX, Officer BECERRA, Officer RAMOLETE, Officer ABREGO and dozens of unknown correctional officers, all witnessed excessive force being used on PLAINTIFFS and failed to have the backbone to stand up to ARROYO's and MENDOZA's unconstitutional commands, and failed to intervene to stop the use of excessive force even though they had the ability and duty to do so.

81.    ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO all watched PLAINTIFFS being subjected to pepper spray, tear gas and flash bang grenades, even though they were complying with all directions and posed no threat to any officer and had the opportunity to intervene and

11

1    stop the attack but did nothing to protect the defenseless women.

2          82.    While the full-scale assault was occurring, PLAINTIFFS were having seizures and other

3    medical emergencies due to being covered in pepper spray and from breathing in tear gas. The officers

4    deploying pepper spray and tear gas all wore gas masks to protect themselves from the harmful irritants.

5          83.    Pepper spray has been determined to cause cardiac arrest in healthy individuals and tear

6    gas has been proven to cause immediate and long-term health effects from exposure, including glaucoma,

7    blindness, and respiratory failure.

8          84.    A 2017 study of data collected over 25 years examined the effects of tear gas on the

9    human body, and determined tear gas can cause severe injuries, permanent disability and death. The use

10   of tear gas can cause death by respiratory failure or cause death by the impact from the exploding

11   canister.

12         85.    ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and all other

13   officers had received training in the use of pepper spray and tear grenades and knew that pepper spray

14   and tear gas can cause death, respiratory failure, seizures, strokes and blindness.

15         86.    ARROYO did not allow any medical providers into the cafeteria to assist PLAINTIFFS,

16   even though PLAINTIFFS were experiencing medical emergencies and needed urgent treatment.

17   ARROYO prevented medical providers from assisting all PLAINTIFFS even though he personally

18   witnessed all PLAINTIFFS choking on tear gas and pepper spray and knew that all PLAINTIFFS

19   required decontamination and medical assistance to treat injuries that ARROYO personally observed.

20         87.    The female inmates who begged for medical assistance, for themselves or others, were

21   told to "Shut the fuck up" and then viciously attacked again at ARROYO's and MENDOZA's orders.

22         88.    PLAINTIFFS were especially vulnerable to the use of pepper spray and tear gas as they

23   had previously diagnosed medical conditions that precluded officers from employing these chemical

24   agents in their presence.

25         89.    PLAINTIFFS suffered severe injuries as a result of ARROYO, MENDOZA, FELIX,

26   RAMOLETE, ABREGO and BECERRA's use of excessive force and the unjustified use of

27   departmentally approved weapons.

28         ///

12

**CHRISTINA WIND**

90.    As described above, WIND was sprayed with pepper spray by FELIX and RAMOLETE at ARROYO's direction. Entire cans of pepper spray were sprayed in WIND and CAMERON's faces by FELIX and RAMOLETE even though they were complying with all CDCR rules and posed no threat to any person.

91.    Approximately 10 officers violently attacked WIND at ARROYO's direction and upon his command for attempting to shield, cover and protect CAMERON. WIND was struck with fists and batons and beaten savagely while posing no threat to any officer or inmate. After the incident, her body was covered with bruises, contusions, scrapes and abrasions and the left side of her face was swollen from being slammed on the floor by officers.

92.    WIND was struck in the head by batons with such force that she passed out and lost consciousness. WIND suffered respiratory failure due to the use of chemical agents and was frothing at the mouth and vomiting while unconscious.

93.    ARROYO personally observed WIND being attacked, losing consciousness and frothing at the mouth, but ordered medical providers not to enter the cafeteria to assist.

94.    Once WIND regained consciousness, the left side of her face was sagging and it would have appeared to any trained person that she was suffering a stroke. Unknown correctional officers continued to beat her after seeing her condition and after she was rendered completely helpless and zip-ties placed on her wrists.

95.    ARROYO commanded his officers to beat WIND with batons even though she was unconscious and completely defenseless.

96.    WIND was eventually dragged from the cafeteria to a grassy area outside.

97.    Once WIND regained consciousness, WIND begged for medical assistance. ARROYO ordered officers and medical providers not to assist or render aid to WIND outside of the cafeteria.

98.    WIND was not provided medical treatment after the violent assault and was simply sent to administrative segregation ("Ad-Seg.") where she spent 11 days in isolation. After returning to her cell, her cellmates noted that the left side of her face was still sagging.

99.    When WIND was finally examined by medical providers, it was determined that she had

13

internal swelling and had likely suffered a stroke.

100.    WIND is still suffering daily from being violently attacked and experiences mental and emotional distress and daily pain and discomfort.

101.    Video exists of WIND and CAMERON being sprayed with pepper spray, having tear gas and flashbang grenades thrown at them and the violent beating of WIND and CAMERON by approximately 10 officers with batons at ARROYO's direction.

102.    Internal Affairs ("IA") officers from Sacramento apologized to WIND after arriving at CCWF and she was finally released from Ad-Seg.

### CATRINA CAMERON

103.    ARROYO ordered officers to throw tear gas and flashbang grenades at WIND and CAMERON while they lay on the ground gasping for air. At least three tear gas canisters exploded next to or on CAMERON while she was motionless on the floor.

104.    Sergeant FELIX ripped off CAMERON's prescription eyeglasses during the violent attack by officers and intentionally stepped on them to destroy them.

105.    ARROYO and the officers who were attacking the inmates at his direction were laughing as they carried out their attack. ARROYO personally observed officers using excessive force on CAMERON but failed to stop their attack and encouraged them to continue.

106.    CAMERON completely lost her eyesight after the violent assault as a result of RAMOLETE and FELIX spraying their entire cans of pepper spray directly into her eyes and being subjected to prolonged exposure to tear gas.

107.    Medical staff at CCWF have informed her that she is legally blind and has a disability. CAMERON was subsequently issued a prison vest that indicates she is vision impaired.

108.    CAMERON was denied medical treatment by ARROYO after the incident. ARROYO would not allow medical providers into the cafeteria to treat CAMERON even though he observed that she required urgent medical treatment.

109.    CAMERON was covered in bruises, abrasions, pepper spray and tear gas after the incident but ARROYO would not allow CAMERON to be sent for decontamination or to be seen by medical providers.

14

110.    CAMERON had a seizure after being subjected to pepper spray and tear gas after being returned to her cell. CAMERON was denied the ability to see a medical provider after being returned to her cell and having a seizure.

111.    CAMERON is currently waiting to be seen by an ophthalmologist and cardiologist for her injuries. CAMERON continues to experience mental and emotional distress from the violence inflicted upon her on August 2, 2024.

### ANTOINETTE YANCEY

112.    YANCEY had been diagnosed with having a stroke on the morning of August 2, 2024, prior to being attacked by the officers, and was wearing an ADA mobility vest at the time of the attack.

113.    YANCEY had been informed by medical staff that morning to "avoid any stressful situations."

114.    ARROYO knew and was aware that YANCEY had suffered a stroke the morning of August 2, 2024, as he was the officer who responded to the urgent call for medical assistance by YANCEY from her cell. ARROYO transported YANCEY to the medical ward for examination and treatment and was present while medical providers were providing their diagnosis and treatment.

115.    YANCEY begged ARROYO and the officers not to spray her with pepper spray and throw tear gas grenades at her. ARROYO ordered Officer BECERRA to spray YANCEY with pepper spray even though she was disabled, complying with all of the officers' orders, posed no threat to anyone and had previously suffered a stroke prior to being locked in the cafeteria.

116.    YANCEY was choking on pepper spray and tear gas when she lost consciousness in the cafeteria. YANCEY regained consciousness on the floor and began screaming for help.

117.    YANCERY remembers officers running past her to attack women who were trying to distance themselves from pepper spray and tear gas grenades.

118.    YANCEY witnessed officers slamming female inmates with mobility assistive devices ("walkers") to the floor and officers throwing tear gas and flash bang grenades at inmates' heads in violation of CDCR rules prohibiting the use of these devices as explosives intended to cause harm.

119.    YANCEY passed out a second time due to respiratory failure and woke up while being placed in zip-ties.

15

120.    ARROYO personally observed YANCEY losing consciousness and needing medical attention but ordered medical providers not to enter the cafeteria to assist and render aid.

121.    An unknown officer saw that YANCEY was losing consciousness again and told her "I am going to get you out of here." The officer picked YANCEY up from the floor and dragged her outside where she was thrown on the ground.

122.    Outside on the grass, temperatures were well over 100 degrees. YANCEY lost consciousness a third time outside on the grass. When YANCEY regained consciousness, she saw officers using pepper spray on female inmates who had been placed in zip ties and officers throwing tear gas and flash bang grenades at women in zip ties.

123.    YANCEY was sprayed with pepper spray again, even though she was in restraints, and officers threw additional tear gas grenades at her. This continued for approximately 30 minutes outside on the grass.

124.    YANCEY saw ARROYO outside on the grass area, and ARROYO was directing his subordinate officers to pepper spray and throw tear gas grenades at YANCEY, after she had been removed from the cafeteria.

125.    YANCEY saw officers fist-bumping each other and congratulating themselves for violently assaulting the female inmates.

126.    After the incident, YANCEY has had ongoing medical problems with difficulty breathing, panic attacks, a left leg/thigh injury, and is now seeking mental health treatment. YANCEY continues to experience mental and emotional distress after the events of August 2, 2024, and is now classified as Triple CMS (certified as someone who is in urgent need of mental health services).

**DONYETTE CLARK**

127.    ARROYO ordered officers to spray CLARK with pepper spray and throw tear gas grenades at her in the cafeteria, even though she was complying with all orders and directions.

128.    After being subjected to pepper spray and tear gas, CLARK had a violent seizure and began thrashing around on the floor, something she had never experienced in her life before. ARROYO personally observed CLARK having a violent seizure on the floor but ordered medical providers not to enter the cafeteria to assist and render aid.

16

129.    CLARK lost consciousness from being repeatedly sprayed with pepper spray and having multiple tear gas and flash bang grenades exploding around her. CLARK experienced respiratory failure from the tear gas and pepper spray.

130.    Instead of providing medical aid to CLARK, ARROYO ordered officers to continue the violent assault.

131.    CLARK regained consciousness while she was being dragged outside of the cafeteria by an officer who commented "I saved your life" as he was proud of himself for rescuing CLARK from the war zone created by ARROYO.

132.    CLARK was taken to an area outside on the grass near a medical awning where ARROYO was continuing to order officers to use pepper spray and tear gas and flash bang grenades on restrained inmates. Officers informed CLARK that she had 2 seizures and the officers were laughing about it.

133.    CLARK saw ARROYO ordering medical providers not to provide aid to CLARK and the other inmates who were in need of urgent care.

134.    CLARK saw inmates being sprayed with pepper spray and having tear gas grenades thrown at them while in zip ties in the grass area.

135.    CLARK was eventually placed in a neck brace by medical providers who were attempting to shield her from the 100 plus degree temperatures. CLARK was covered from head to toe in pepper spray and her skin was burning as though she was on fire.

136.    At one point, CLARK was told that she was the next to receive treatment. That changed as another inmate began having a seizure next to her, and medical providers had to begin life-saving measures to treat that inmate.

137.    CLARK was eventually transported to Mercy Medical Center in Madera for treatment.

138.    CLARK had been kicked by an officer while she was unconscious and having a seizure and had a boot print on her CCWF issued clothing. CLARK also had bruises, abrasions and scrapes from the violent assault.

139.    CLARK was diagnosed with peripheral vertigo after the incident, which causes her dizziness and greatly affected her balance and ability to walk. CLARK continues to suffer mental and

17

emotional distress from the incident.

140.    CLARK has been unable to return to the cafeteria since August 2, 2024, and has been forced to buy her own food through commissary, which has cost her approximately $1200 dollars.

141.    CLARK has been diagnosed with PTSD as a result of the trauma that she experienced on August 2, 2024.

### JAMIE MONROE

142.    JAMIE MONROE "(MONROE") is an ADA inmate and wears a brightly colored mobility vest to signal to staff that she has a medical disability. MONROE had recently been injured while working at CCWF after not being properly trained on how to use a saw at her Prison Industry Authority work assignment.

143.    On the day of August 2, 2024, MONROE had 20 staples and 10 stitches in her leg and was not required to get on the floor as directed by officers but did as ordered even though it caused her extreme pain and aggravated her prior injury.

144.    Officers in the cafeteria yelled "Get down bitch!," at MONROE, even though she was not required to comply, and not required to get down on the ground due to her prior injury.

145.    ARROYO ordered officers to spray MONROE with pepper spray and throw tear gas and flash bang grenades at her, even though she had complied with all orders and directions.

146.    MONROE required urgent medical treatment in the cafeteria, but ARROYO ordered medical providers not to enter the cafeteria to treat MONROE and the other injured inmates.

147.    MONROE was eventually placed in zip ties and taken to the grass area outside of the cafeteria.

148.    Officer ABREGO approached MONROE, took a knife and began to remove the zip ties from MONROE so that she could be examined and treated by medical staff positioned nearby.

149.    While using her knife to remove the zip ties, ABREGO stabbed MONROE in the hand, causing bleeding and extreme pain.

150.    Instead of immediately summoning medical help, ABREGO smiled at MONROE and appeared happy that she had cut MONROE.

151.    MONROE had multiple panic attacks the night of August 2, 2024. MONROE continues to

18

have recurring nightmares of being shot by officers and these nightmares include seeing the entire area outside the cafeteria covered in blood.

152.    CDCR medical providers have prescribed psychiatric medication to MONROE to alleviate the anxiety, depression and night terrors she has experienced since August 2, 2024.

153.    MONROE can no longer sit or stand for longer than 20 minutes at a time due to the nerve damage that she suffered on August 2, 2024, and can no longer earn any wages while employed in prison due to her injuries. MONROE is making a wage loss/loss of earning capacity claim in this matter.

154.    MONROE is serving a life without parole sentence, and the way she mentally coped with her incarceration was exercise and working out in the gym.

155.    MONROE is no longer able to exercise due to nerve damage in her leg. MONROE now has to walk with a cane and has a permanent limp.

**ANNA SALINAS**

156.    ANNA SALINAS ("SALINAS") was in the cafeteria and complying with all orders and directions at the time that ARROYO ordered officers to pepper spray and throw tear gas and flash bang grenades at her.

157.    Once explosions started occurring, SALINAS began experiencing respiratory failure, fell down, hit her head on the floor and started having a seizure.

158.    SALINAS was convulsing for several minutes and urinated on herself while having a seizure.

159.    Once SALINAS regained consciousness, she saw officers throwing tear gas grenades at inmates and officers threw tear gas and flash-bang grenades directly at her, in violation of CDCR rules.

160.    ARROYO ordered subordinate officers to pepper spray and throw tear gas and flash-bang grenades at SALINAS even though she was completely defenseless and posed no threat to anyone.

161.    ARROYO ordered medical providers not to enter the cafeteria to treat SALINAS, even though he knew and was aware of her seizure and saw that she had urinated on herself.

162.    SALINAS was eventually dragged in zip ties from the cafeteria to the grass area. Officers continued to pepper spray and throw tear gas grenades at SALINAS and the other female inmates outside even though she was in zip ties and restrained.

19

163.    ARROYO ordered officers to pepper spray and throw tear gas grenades at SALINAS even though she was restrained in zip ties.

164.    SALINAS was conscious for a short period on the grass but began having another seizure. The other female inmates in the grass area began yelling "medical emergency!"

165.    Two unknown sergeants were both outside on the grass area using pepper spray against the restrained female inmates, including SALINAS. This was occurring at ARROYO's direction and command. These Sergeants will be added as defendants once their full names are discovered.

166.    Officer BECERRA was also present at the grass area with the restrained inmates and was throwing tear gas grenades and using pepper spray.

167.    Officer BECERRA sprayed SALINAS with pepper spray while restrained and posing no threat to any officer. ARROYO ordered BECERRA to spray SALINAS with pepper spray even though she was complying with all orders and was restrained with zip ties.

168.    SALINAS regained consciousness at the medical ward in the prison on a gurney. SALINAS had a golf-ball sized lump on her forehead and numerous bruises, abrasions and other soft tissue injuries.

169.    SALINAS was also having extreme difficulty breathing as she suffers from asthma and had inhaled pepper spray and tear gas.

170.    SALINAS was transported from CCWF to Mercy Medical Center in Madera for evaluation and treatment. During transport, she frequently passed out due to being in severe pain. SALINAS had not been decontaminated prior to transport, was still covered in urine and pepper spray and had no shoes or socks. Medical providers diagnosed SALINAS with a traumatic brain injury.

171.    SALINAS was later contacted by individuals from the Office of the Ombudsman, who apologized for what happened that day and for her despicable treatment at the hands of ARROYO and the other officers.

**WISDOM MUHAMMAD**

172.    WISDOM MUHAMMAD ("MUHAMMAD") was housed in Delta Yard and taken to the cafeteria on August 2, 2024.

173.    MUHAMMAD heard and saw ARROYO give officers the order to turn off their body

worn cameras prior to ordering the officers to use pepper spray and tear gas and flash-bang grenades against her and the other female inmates who were complying with all directions and orders.

174.    MUHAMMAD suffers from severe asthma and begged the officers not to use pepper spray on her. The officers told MUHAMMAD to "Shut the fuck up!" prior to pepper spraying her.

175.    MUHAMMAD got on the floor in a prone position to show that she was not a threat. The officers sprayed her with pepper spray and threw tear gas grenades at her even though she was compliant. This occurred at ARROYO's direction and command.

176.    The entire cafeteria was filled with pepper spray and tear gas, and MUHAMMAD could not breathe. The officers wore gas masks so that they could continue their violent assault.

177.    ARROYO ordered medical providers not to enter the cafeteria to examine and treat MUHAMMAD even though he personally observed that MUHAMMAD could not breathe due to prolonged exposure to pepper spray and tear gas.

178.    MUHAMMAD cried and begged officers to "please handcuff me" as she hoped they would drag her out of the cafeteria. OFFICERS placed MUHAMMAD in zip ties, threw her back to the ground, and when MUHAMMAD said the zip ties were too tight, officers responded "I don't give a fuck!"

179.    MUHAMMAD was dragged outside to the grass area where the officers were still spraying pepper spray and throwing tear gas grenades at inmates in zip ties.

180.    MUHAMMAD had 4 tear gas grenades thrown directly at her while in zip ties out on the grass. These tear gas grenades were thrown at ARROYO's direction and command. One of the tear gas grenades was thrown directly at and exploded right next to MUHAMMAD's face, which caused a permanent scar and black eye.

181.    MUHAMMAD hoped that she would die to end the pain and suffering that she was experiencing at the hands of ARROYO and his officers.

182.    MUHAMMAD begged an officer to stop the violent assault and his response was "Shut up black bitch."

183.    The repeated attacks and violent use of force caused MUHAMMAD to lose consciousness twice, have seizures, and urinate on herself. MUHAMMAD eventually regained consciousness in an

21

ambulance with blood all over her, an IV in her arm, and was unable to see out of her left eye. MUHAMMAD has not regained vision in her left eye.

184.    MUHAMMAD was taken to Mercy Medical Center in Madera and was not decontaminated prior to transport. When she arrived at Mercy, she was covered in pepper spray with her eyes and lungs still burning.

185.    MUHAMMAD has continued to experience seizures since August 2, 2024, something she had never experienced prior to August 2, 2024.

186.    MUHAMMAD has been unable to return to the cafeteria since August 2, 2024, as returning is too traumatic and triggers severe mental and emotional distress. MUHAMMAD has been forced to spend her own funds for food in order to avoid the cafeteria.

**ELAINE DE LEON GUERRERO**

187.    ELAINE DE LEON GUERRERO ("DE LEON GUERRERO") is an "Honorably Discharged" veteran from the Army who served active duty in Iraq and Kuwait.

188.    DE LEON GUERRERO was housed in 513 and taken to the cafeteria on August 2, 2024. DE LEON GUERRERO had previously been diagnosed while in custody at CCWF with asthma, severe post-traumatic stress disorder and a back injury.

189.    DE LEON GUERRERO was diagnosed with PTSD while in the Army after the truck she was riding in was hit with 14 rockets and mortar rounds. The rockets and mortar rounds killed three of her friends and seriously wounded two others. DE LEON GUERRERO was sent out afterwards to retrieve her friends' remains.

190.    On August 2, 2024, DE LEON GUERRERO was sprayed with pepper spray and had tear gas and flash-bang grenades thrown at her at ARROYO's direction and command.

191.    Some of the officers were yelling "Get down!" while other officers were yelling "Get up!" while the violent attack was occurring, which confused the female inmates subject to the violent assault.

192.    DE LEON GUERRERO was confused by the conflicting orders, was trying to comply and begging officers not to shoot her with rubber bullets and bean bag rounds.

193.    DE LEON GUERRERO was prone on the ground choking on pepper spray and tear gas when an officer rolled a tear gas grenade under her body, which exploded, destroying her eyeglasses and

covering her in tear gas.

194. ARROYO ordered medical providers not to enter the cafeteria even though he knew DE LEON GUERRERO required urgent medical evaluation and treatment as he saw her choking, and unable to breathe.

195. DE LEON GEURRERO was trampled by other inmates who were trying to get away from the exploding tear gas and flash-bang grenades. This caused DE LEON GEURRERO's back to be re-injured.

196. Someone opened a door to an outside area, and DE LEON GUERRERO attempted to exit the cafeteria. Officers immediately yelled "Close the door!" to keep the inmates in the cafeteria and to continue their violent assault.

197. Once DE LEON GUERRERO was removed from the cafeteria in zip ties, she was taken to the grass area and was sprayed with pepper spray and subjected to tear gas grenades again. ARROYO was outside and was directing the officers to continue their attack on the restrained women, including DE LEON GUERRERO.

198. ARROYO ordered officers to spray DE LEON GUERRERO with pepper spray and throw tear gas grenades at her while in zip ties. DE LEON GUERRERO was forced to inhale tear gas, had her back re-injured by officers while they were assaulting her, and sustained injuries to her chest and head.

199. ARROYO prevented DE LEON GUERRERO from getting urgent medical treatment by ordering medical providers to "stay back" while outside of the cafeteria and allowing the officers to continue their criminal acts.

200. DE LEON GUERRERO witnessed officers so disgusted by ARROYO and MENDOZA's violent attack on the compliant women that they just walked away and refused to participate anymore.

201. CCWF has denied DE LEON GUERRERO's requests for mental health treatment after being violently assaulted by officers.

202. DE LEON GUERRERO has been unable to return to the cafeteria since August 2, 2024, as it triggers her severe PTSD. DE LEON GUERRERO has requested a medical accommodation to have her trays delivered to her cell, but her accommodation request was denied on the grounds that she has had PTSD for over a decade.

203.    DE LEON GUERRERO was informed on August 2, 2024, after the incident, that her mother passed away that day.

### SHANNON GUTIERREZ

204.    SHANNON GUTIERREZ ("GUTIERREZ") was housed in 513 and taken to the cafeteria on August 2, 2024. GUTIERREZ has impaired mobility after having suffered a prior back injury and had been provided a wheelchair by medical providers for use during her confinement at CCWF. GUTIERREZ was confined to the wheelchair on August 2, 2024.

205.    GUTIERREZ informed the officers surrounding her in the cafeteria that she was disabled and could not get on the ground, and their response was "I don't give a fuck, get on the ground!" GUTIERREZ painfully exited the wheelchair and sat on the ground to comply with the orders.

206.    After she sat on the floor, officers sprayed her with pepper spray and threw tear gas and flash-bang grenades at her. ARROYO commanded officers to use force against GUTIERREZ even though she was compliant.

207.    GUTIERREZ struggled to get away from the tear gas grenades exploding right next to her. MENDOZA, seeing that GUTIERREZ was crawling away from the tear gas grenades, ordered officers to shoot her with rubber bullets, and empty entire cans of pepper spray on her while attempting to protect herself from the attack. GUTIERREZ was shot with rubber bullets after MENDOZA's order.

208.    ARROYO ordered medical providers not to enter the cafeteria even though he knew GUTIERREZ required urgent medical evaluation and treatment, as she was covered in pepper spray and tear gas and could not breathe.

209.    GUTIERREZ was covered from head to toe in pepper spray, multiple tear gas grenades exploded on and around her, and she was covered in bruises, scrapes, and cuts. GUTIERREZ was also shot with rubber bullets at MENDOZA's direction even though she was compliant with all orders.

### TANESHA RANDOLPH

210.    TANESHA RANDOLPH ("RANDOLPH") was housed in 513 and taken to the cafeteria on August 2, 2024.

211.    ARROYO ordered officers to spray RANDOLPH with pepper spray and throw tear gas and flash-bang grenades at her while in the cafeteria.

24

212. RANDOLPH was complying with all orders and commands at the time that she was violently attacked and subjected to tear gas and pepper spray.

213. RANDOLPH attempted to get away from the exploding tear gas and flash-bang grenades but officers shut and locked a door that she had hoped to use to exit the cafeteria. ARROYO ordered officers to close and lock the door.

214. ARROYO also ordered the officers to "Shoot!" and "Spray!" RANDOLPH and the other inmates with pepper spray while they were complying with orders.

215. RANDOLPH lost consciousness in the cafeteria due to being pepper sprayed and having tear gas and flash-bang grenades exploding on and around her.

216. After RANDOLPH lost consciousness, she began having seizures and convulsions, and her cellmate attempted to drag her to safety for fear of her being trampled by inmates and/or officers.

217. ARROYO ordered medical providers not to enter the cafeteria even though he knew RANDOLPH was having seizures and convulsions and required urgent medical evaluation and treatment.

218. RANDOLPH was covered in bruises, scrapes and abrasions after the incident.

219. When RANDOLPH regained consciousness, she begged officers to cuff her and remove her from the cafeteria.

220. RANDOLPH was eventually removed from the cafeteria in zip ties and taken to the grass area outside.

221. RANDOLPH was not decontaminated and was not provided any medical assistance for her injuries, which included scrapes and abrasions to her knees and being covered in pepper spray and tear gas. ARROYO ordered medical providers to "stay back" and not treat RANDOLPH.

222. After the assault ended, RANDOLPH was informed it was a "Training Day" and that they were using the violent assault to train officers on the use of force.

223. Medical staff were stationed nearby and several were trying to approach RANDOLPH and the other female inmates that were having seizures and convulsing due to the use of pepper spray and tear gas. ARROYO ordered the medical providers to stay back and not assist PLAINTIFFS even though he knew and was aware that they required urgent medical care.

224. Several of the medical staff were crying based on what they were witnessing at the hands

25

of ARROYO and his officers and their inability to help.

225.    ARROYO personally intervened and prevented PLAINTIFFS, including RANDOLPH, from receiving timely and necessary medical care.

**REINA REYES**

226.    REINA REYES ("REYES") was housed in 513 and taken to the cafeteria on August 2, 2024.

227.    REYES witnessed ARROYO throw the first tear gas grenade at PLAINTIFFS and the compliant group of female inmates huddled in the cafeteria.

228.    REYES had previously been diagnosed with severe asthma and COPD and had previous severe asthma attacks when no chemical agents were present.

229.    REYES's cellmate was present in the cafeteria and knew her prior medical diagnoses included severe asthma and COPD. REYES's cellmate attempted to shield her from the use of pepper spray and tear gas by giving her a T-shirt to wrap around her face.

230.    REYES could not breathe because of the use of pepper spray and tear gas grenades and thought she was going to die.

231.    ARROYO ordered officers to spray REYES with pepper spray and throw tear gas grenades at her, even though she was complying with all directions and orders.

232.    REYES went into respiratory distress and she lost consciousness during the attack.

233.    REYES was eventually handcuffed and dragged outside to the grass area outside of the cafeteria while still unconscious.

234.    REYES was foaming at the mouth and remembers hearing someone yelling "She is not breathing, she is not breathing!" An inmate tried to put something under her head as she foamed at the mouth so that her airway was not obstructed.

235.    Eventually, she was thrown into a wheelchair with her hands still handcuffed behind her back, which only exacerbated her respiratory difficulties.

236.    REYES regained consciousness in 701, the medical unit, while completely covered in pepper spray, tear gas, and was connected to a respiratory device to monitor her breathing and provide supplemental oxygen.

237.    REYES suffered another asthma attack while undergoing treatment in 701 and again thought she would die.

238.    A nurse informed her that she should not go to an outside facility for treatment as officers would retaliate for seeking outside medical care.

239.    REYES subsequently had an allergic reaction to the chemical agents which caused an infection in her lungs requiring additional medications and hospitalization.

240.    It took several weeks for the bruises and abrasions covering REYES' body to fully heal.

**AMILIA MANZANO**

241.    AMILIA MANZANO was housed in Delta Yard and was taken to the cafeteria on August 2, 2024.

242.    MANZANO was subjected to pepper spray and tear gas by officers in the cafeteria. MANZANO saw ARROYO giving the officer's orders to pepper spray and tear gas her even though she was complying with all of the officer's orders.

243.    MANZANO saw ARROYO pointing at other compliant female inmates and ordering the officers to pepper spray and throw tear gas grenades at them.

244.    MANZANO saw and heard ARROYO order officers to beat WIND and CAMERON with batons even though they were compliant and posed no threat to any officer.

245.    MANZANO saw FELIX and RAMOLETE use their entire pepper spray cans against CAMERON and WIND even though they begged for officers not to pepper spray them due to CAMERON having severe asthma and a pacemaker.

246.    According to MANZANO, officers "beat the shit out of WIND" with batons at ARROYO's command.

247.    MANZANO was prone on the ground and was trampled by inmates and officers during the chaos caused by ARROYO's assault on peaceful inmates. MANZANO was kicked in the head during the chaos, causing a permanent lump on her forehead.

248.    MANZANO had a seizure from the tear gas and pepper spray, fainted and lost consciousness, and her cellmates were calling for officers and medical providers to assist with MANZANO's urgent need for medical assistance. ARROYO ordered medical providers to stay back and

27

not render aid to MANZANO.

249.    MANZANO was transported out of the prison to a hospital in Madera the night of August 2, 2024, where medical providers diagnosed her with a concussion. MANZANO was returned to CCWF that night.

250.    MANZANO continued to vomit for 24 hours after the incident, requiring CDCR to transport her back to the hospital for evaluation and treatment of a traumatic brain injury.

251.    MANZANO's body was covered in bruises, scrapes and contusions after the incident.

### NICOLE MILAN

252.    NICOLE MILAN ("MILAN") was ordered to go to the cafeteria on August 2, 2024.

253.    In the cafeteria, MILAN saw ARROYO giving orders to his subordinate officers to pepper spray and throw tear gas grenades at female inmates, including PLAINTIFFS, that were complying with officers' orders and verbal commands.

254.    MILAN was subjected to both pepper spray and tear gas grenades at ARROYO's direction, even though she was sitting down and complying with all orders. The tear gas and pepper spray in the cafeteria made it impossible for MILAN to see and breathe.

255.    MILAN had previously been diagnosed with carpal tunnel syndrome while in custody at CCWF and this condition causes pain, numbness, tingling and weakness in her hands and wrists.

256.    MILAN had also been previously diagnosed with Raynaud's syndrome while at CCWF which is a condition that causes blood vessels in her fingers to narrow in response to emotional distress, causing extreme pain, sores and in extended cases can lead to gangrene.

257.    After being subjected to pepper spray and tear gas at ARROYO's direction, even though she was complying with all orders and commands, unknown custodial officers placed zip ties so tightly on her wrists that her hands became swollen and turned purple. The zip ties were so tight that they cut into MILAN's wrists and left permanent scars.

258.    MILAN informed the officers of her prior diagnoses for carpal tunnel syndrome and Raynaud's syndrome and begged officers to loosen the zip ties but was ignored.

259.    Placing excessively tight zip ties on MILAN aggravated MILAN's pre-existing medical conditions and has caused permanent injury to her fingers and wrists.

28

260.    MILAN begged unknown officers for medical treatment after the zip ties were removed. Officers denied her the right to complete a timely CDCR 7219 examination. This denial came from ARROYO who had ordered medical providers to "stay back" and not treat MILAN and the other injured inmates.

261.    MILAN continues to experience daily mental and emotional distress after being subjected to excessive and unnecessary force by ARROYO and the officers under his command.

262.    MILAN has frequent nightmares about the incident and it is very difficult for her to return to the cafeteria as she now suffers from PTSD.

### POST AUGUST 2, 2024

263.    For a five-day period after August 2, 2024, all of the women in 513 were ordered locked in their cells with no privileges.

264.    Once lockdown ended, CDCR offered the female inmates mental health counseling but required that the female inmates go to the cafeteria where they were assaulted to receive the counseling.

265.    ARROYO, MENDOZA, FELIX, BECERRA, RAMOLETE and others tried to cover-up their criminal acts by issuing Rules Violation Reports ("RVRs" or "115s) against the victims of their crimes.

266.    The RVRs were issued to inmates that underwent a CDCR 7219 examination after having been injured and were meant to exonerate the officers by painting the victims as aggressors. This was another act by the "Delta Dogs" in furtherance of their conspiracy to retaliate and keep inmates silent about officer misconduct and criminal acts.

267.    WIND and CAMERON were issued 115s alleging that they were "obstructing a peace officer" in violation of CDCR rules. The 115s to WIND and CAMERON were issued by RAMOLETE. They were found "Not Guilty" after their disciplinary hearings.

268.    Even though CDCR found WIND "Not Guilty" after hearing, ARROYO made sure that WIND received punishment, including 120 days of A1 status (no canteen, no mail, phone and day room losses, and no yard time). ARROYO also eliminated 60 days of good time credit and extended WIND's release date.

269.    CDCR's Office of Internal Affairs ("OIA") from Sacramento came to CCWF and

29

1    informed WIND and CAMERON that a "grievous error" had been committed against them.

2        270.    OIA informed WIND and CAMERON that CCWF would not allow OIA to see the video

3    camera footage taken from August 2, 2024, "because it was so horrendous."

4        271.    WIND had previously observed video of her and CAMERON being assaulted, pepper-

5    sprayed and tear-gassed during her RVR hearing.

6        272.    YANCEY was issued a 115 for "obstructing/assaulting a peace officer". YANCEY plead

7    "Not Guilty" and asked for all evidence relating to the charges.

8        273.    CCWF informed YANCEY that 'the cameras were not working" and she was found not

9    guilty of the alleged rules violation.

10        274.    YANCEY met with a woman from the Ombudsman Office from Sacramento who

11    conveyed that she disagreed with ARROYO's handling of August 2, 2024, and apologized for her

12    mistreatment at the hands of ARROYO.

13        275.    Captain Castillo and Lieutenant Quintero also apologized to YANCEY and said that what

14    happened to her "should have never happened."

15        276.    CLARK was issued a 115 for "obstructing a peace officer." Two Lieutenants were present

16    at her RVR hearing from Valley State Prison ("VSP"). Lieutenant Salas from VSP told her that her rights

17    had been violated, and she was found "Not Guilty" at her hearing.

18        277.    MONROE was issued a 115 for being "Involved in a Riot." The 115 was dismissed by

19    CDCR as CDCR said they had no video of MONROE being involved in any riot. Even though the 115

20    was dismissed, the 115 bars MONROE from changing housing assignments, and provides a target to

21    other officers that MONROE was involved in August 2, 2024.

22        278.    SALINAS was given a 115 for "Obstructing a Peace Officer." SALINAS was found "Not

23    Guilty" after hearing.

24        279.    REYES was issued a 115 for "disobeying an officer's orders." REINA REYES was found

25    "Not Guilty" after her disciplinary hearing.

26        280.    PLAINTIFFS filed 602 grievances against ARROYO, MENDOZA and the other

27    unknown correctional officers that violently attacked them on August 2, 2024.

28        281.    CDCR has not issued any discipline against ARROYO, MENDOZA, FELIX, BECERRA,

30

1  RAMOLETE, ABREGO or any of the officers involved. ARROYO and BECERRA were simply

2  transferred to another prison. BECERRA has now been returned to CCWF.

3      282.    On August 21, 2024, Warden De La Cruz held a "Trauma Event" to talk about August 2,

4  2024, with all of the women housed in 513. This occurred from 9:45 to 11:45 a.m. The flyer for this

5  event stated the event was to "Release and Heal" and was advertised as a day to come together and

6  recover from any trauma that occurred on August 2, 2024. (See Attached Exhibit A)

7      283.    At CCWF, in the "Program Office" at D yard, the custodial officers at CCWF have put up

8  a picture of ARROYO and above the picture it says, "SAVE A LIFE, BRING BACK ARROYO!." This

9  picture is still present and still causes all PLAINTIFFS emotional and mental distress every time they see

10  it.

11                          **<u>FIRST CLAIM FOR RELIEF</u>**

12                          **"Cruel and Unusual Punishment"**

13                              **(42 U.S.C. § 1983)**

14      *Against ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

15      284.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 283, as though

16  fully set forth herein.

17      285.    All PLAINTIFFS assert Eighth Amendment claims against ARROYO, MENDOZA and

18  DOES 1 to 60. PLAINTIFFS assert an Eighth Amendment claim against ARROYO for his excessive

19  uses of force against PLAINTIFFS. The Eighth Amendment claim brought by PLAINTIFFS against

20  MENDOZA is based upon a failure to intervene theory.

21      286.    WIND and CAMERON also assert Eighth Amendment claims against FELIX and

22  RAMOLETE for using excessive force.

23      287.    YANCEY also asserts an Eighth Amendment claim against BECERRA for using

24  excessive force.

25      288.    MONROE also asserts an Eighth Amendment claim against ABREGO for using excessive

26  force.

27      289.    SALINAS also asserts an Eighth Amendment claim against BECERRA for using

28  excessive force.

                                31

290.    PLAINTIFFS also assert Eighth Amendment claims against ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 for failing to intervene to prevent the use of excessive force.

291.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 deprived Plaintiffs of their rights under the Eighth Amendment to be free from "cruel and unusual punishments."  These claims include liability for directly inflicting cruel and unusual punishment, ordering others to use excessive and unnecessary force, as well as under a failure to intervene theory to stop the use of excessive force committed directly in their presence.

292.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 used excessive and unnecessary force under the circumstances as PLAINTIFFS had not engaged in any activity that violated CDCR rules or that placed any officer in threat of harm or injury prior to the use of force.

293.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 personally witnessed other officers using excessive and unnecessary force on PLAINTIFFS and had the opportunity and duty to intervene and stop PLAINTIFFS from being subjected to excessive force but failed to do so.

294.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 acted maliciously and sadistically for the purpose of causing harm and not in a good faith effort to restore or maintain discipline.

295.    The acts of Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 caused harm to PLAINTIFFS, as detailed above.

296.    As a direct and proximate result of said acts by Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress, costs and attorneys' fees.

297.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an

32

1  award of exemplary and punitive damages against Defendants ARROYO, MENDOZA, FELIX,

2  RAMOLETE, BECERRA, ABREGO and DOES 1-60 according to proof.

3      298.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs as

4  allowed by law.

5                    **SECOND CLAIM FOR RELIEF**

6              **"Deliberate Indifference to Serious Medical Needs"**

7                      **(42 U.S.C. § 1983)**

8                  *Against ARROYO and DOES 1-60*

9      299.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 298, as though

10  fully set forth herein.

11      300.    All PLAINTIFFS assert this claim against ARROYO, as ARROYO would not allow any

12  medical providers to enter the cafeteria to treat PLAINTIFFS, even though he was aware that

13  PLAINTIFFS required urgent medical evaluation and treatment.

14      301.    PLAINTIFFS, a group of inmates with severe pre-existing medical diagnoses, had serious

15  medical needs after being subjected to repeated and prolonged exposure to pepper spray, tear gas, the

16  explosions caused by flash-bang grenades, rubber bullets, and the use of excessive and unnecessary force

17  (strikes, kicks, punches and control holds).

18      302.    Defendant ARROYO was deliberately indifferent to PLAINTIFFS' medical needs as he

19  saw PLAINTIFFS having seizures, foaming at the mouth, having convulsions, urinating on themselves

20  and suffering from severe asthma attacks and respiratory arrest.

21      303.    Defendant ARROYO knew PLAINTIFFS were experiencing extreme pain from the

22  violent attack by correctional officers as PLAINTIFFS were pleading with and begging ARROYO for

23  medical help, and ARROYO deliberately disregarded their pleas, ordering medical providers to "Stay

24  back!" as he ordered officers to continue the attack.

25      304.    The acts of ARROYO, in refusing to allow medical providers to examine and treat

26  PLAINTIFFS, caused harm to PLAINTIFFS.

27      305.    ARROYO made the conscious decision to delay and refuse to provide treatment so that he

28  could inflict more pain and suffering on PLAINTIFFS and send the message that PREA complaints

                              33

should not be filed at CCWF.

306.    As a direct and proximate result of said acts and/or omissions by ARROYO and DOES 1 to 60, PLAINTIFFS suffered injuries and damage as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical care, past and future pain and suffering, past and future mental and emotional distress, costs and attorneys' fees

307.    The aforementioned acts and/or omissions of ARROYO were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of PLAINTIFFS, thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against ARROYO according to proof.

308.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs as allowed by law.

### THIRD CLAIM FOR RELIEF

### "Supervisory Liability"

### (42 U.S.C. § 1983)

*AGAINST ARROYO, MENDOZA and DOES 1 to 60*

309.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 308, as though fully set forth herein.

310.    All PLAINTIFFS assert a supervisory liability claim against Sergeant ARROYO and Sergeant MENDOZA for their own personal involvement in the alleged constitutional deprivations, for setting in motion a series of acts by others leading to constitutional deprivations and for failing to terminate acts by others which ARROYO and MENDOZA knew or reasonably should have known would cause their subordinates to inflict constitutional injuries.

311.    ARROYO and MENDOZA set in motion the acts causing harm to PLAINTIFFS by approving retaliatory measures, ordering officers to use excessive and unnecessary force against PLAINTIFFS even though they were complying with all orders, and knew that correctional officers were engaging in the unlawful and excessive use of force and failed to terminate the officers' unlawful acts.

312.    As a direct and proximate result of said acts and/or omissions by ARROYO, MENDOZA and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and as to which PLAINTIFFS are entitled to recover damages for past and future medical care, past and future pain and

34

1  suffering, past and future mental and emotional distress, costs and attorneys' fees.

2      313.    The aforementioned acts and/or omissions of ARROYO, MENDOZA and DOES 1 to 60

3  were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of

4  PLAINTIFFS, thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according

5  to proof.

6      314.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs as

7  allowed by law.

8                          **FOURTH CLAIM FOR RELIEF**

9                         **"California Gender Violence Law"**

10                          **(Cal. Civ. Code § 52.4)**

11                        *Against ARROYO and DOES 1 to 60*

12     315.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 314, as though

13  fully set forth herein.

14     316.    All PLAINTIFFS except MANZANO and MILAN assert a Civil Code Section 52.4 claim

15  against ARROYO.

16     317.    ARROYO inflicted cruel and unusual punishment on PLAINTIFFS because of their

17  gender. ARROYO was unhappy that female inmates in 513 were pursuing PREA claims against male

18  correctional officers and when female inmates continued to file PREA claims, retaliated against every

19  female inmate in 513 by using, and directing his officers to use, excessive force against the female

20  inmates.

21     318.    The actions of ARROYO in using excessive force and ordering other officers to commit

22  acts of violence in response to female inmates filing PREA Complaints and lawsuits after being sexually

23  assaulted by correctional officers, constitute "gender violence" and sex discrimination under Civil Code

24  § 52.4, as those acts constitute criminal offenses under state law and involved physical invasions of their

25  bodily integrity under coercive conditions, whether or not ARROYO is ever charged for his criminal

26  conduct.

27     319.    ARROYO engaged in the use of excessive force against compliant female inmates that

28  included the use of pepper spray, tear gas and flash-bang grenades, rubber bullets and physical acts of

35

**FIRST AMENDED COMPLAINT; DEMAND FOR JURY TRIAL**
*Wind v. State of California, et al*, United States District Court, Eastern District of California

assault and battery on multiple occasions for several hours.

320.    ARROYO performed these acts for the purpose of injuring, humiliating, degrading and demeaning all female PLAINTIFFS and to retaliate against them for the inmates' lawful use of grievance and court redress procedures while in custody.

321.    As a direct and proximate result of said acts by ARROYO and DOES 1 to 60, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress, costs and attorneys' fees.

322.    Defendant ARROYO's acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendant ARROYO according to proof.

323.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs as allowed by law.

**FIFTH CLAIM FOR RELIEF**

**"Tom Bane Civil Rights Act"**

**(California Civil Code § 52.1)**

*Against CDCR, ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO and*

*DOES 1 to 60*

324.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 323, as though fully set forth herein.

325.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO violated PLAINTIFFS' Eighth Amendment right to be free from cruel and unusual punishment, as set forth above.

326.    All PLAINTIFFS except MANZANO and MILAN assert Eighth Amendment claims under the Bane Act against ARROYO and MENDOZA, as set forth above. WIND and CAMERON also assert Eighth Amendment claims under the Bane Act against FELIX and RAMOLETE. YANCEY also asserts Eighth Amendment claims under the Bane Act against BECERRA. MONROE also asserts Eighth Amendment claims under the Bane Act against ABREGO. SALINAS also asserts an Eighth Amendment

36

claim under the Bane Act against BECERRA.

327.    All PLAINTIFFS except MANZANO and MILAN bring Eighth Amendment claims under the Bane Act against Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 for failing to intercede to stop other correctional officers from engaging in excessive force, with deliberate indifference or reckless disregard of rights protected by the Eighth and Fourteenth Amendments to the U.S. Constitution.

328.    All PLAINTIFFS except MANZANO and MILAN assert an Eighth Amendment claim under the Bane Act against ARROYO and MENDOZA for supervisory liability.

329.    PLAINTIFFS were harmed by Defendants' actions and omissions and their conduct was a substantial factor in causing PLAINTIFFS' harm

330.    ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO's actions constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages according to proof.

331.    Defendant CDCR is vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a) and 820(a), for injuries proximately caused by the acts and omissions of their employees acting within the scope of their employment.

332.    PLAINTIFFS were injured as a direct and proximate result of Defendants' actions and inactions, entitling them to receive compensatory and treble damages and civil penalties against Defendants as allowed by law.

333.    PLAINTIFFS are also entitled to an award of reasonable attorneys' fees and costs pursuant to Civil Code Section 52.1 and as allowed by law.

### SIXTH CLAIM FOR RELIEF

#### "Battery"

#### (California Common Law)

*Against ARROYO, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

334.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 333, as though fully set forth herein.

335.    All PLAINTIFFS except MANZANO and MILAN assert claims for battery against

37

ARROYO as set forth above. WIND and CAMERON also assert battery claims against FELIX and RAMOLETE, as set forth above. YANCEY also asserts a battery claim against BECERRA as set forth above. MONROE also asserts a battery claim against ABREGO as set forth above. SALINAS also asserts a battery claim against BECERRA as set forth above.

336.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA and ABREGO acted with the intent to cause a harmful or offensive contact by repeatedly using excessive and unnecessary force against Plaintiffs while they were under Defendants' care, custody and control as inmates at CCWF.

337.    PLAINTIFFS did not consent to being touched by Defendants and did not consent to being assaulted and battered while in custody by Defendants.

338.    PLAINTIFFS were harmed by Defendants' conduct.

339.    As a direct and proximate result of said acts by Defendants, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

340.    Defendants' acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendants according to proof.

## SEVENTH CLAIM FOR RELIEF

### "Assault"

### (California Common Law)

Against ARROYO, FELIX, RAMOLETE, BECERRA, ABREGO

and DOES 1 to 60

341.    PLAINTIFFS re-allege and incorporates by reference paragraphs 1 through 340, as though fully set forth herein.

342.    All PLAINTIFFS except MANZANO and MILAN assert claims against ARROYO for assault, as set forth above. WIND and CAMERON also  assert an assault claim against FELIX and RAMOLETE, as set forth above. YANCEY also asserts a claim for assault against BECERRA as set forth above. SALINAS also asserts a claim for assault against BECERRA as set forth above.

38

343.    PLAINTIFFS knew and were aware that ARROYO intended to inflict immediate injury upon PLAINTIFFS and were directing other officers to inflict immediate injuries upon PLAINTIFFS, prior to the use of pepper spray and tear gas and flash-bangs being deployed.

344.    WIND and CAMERON were aware and had observed FELIX and RAMOLETE preparing to use pepper spray against them prior to pepper spray being deployed.

345.    YANCEY was aware and knew that BECERRA intended to deploy pepper spray prior to BECERRA spraying YANCEY with pepper spray.

346.    SALINAS knew and was aware that BECERRA intended to use pepper spray against her prior to BECERRA deploying the pepper spray.

347.    PLAINTIFFS were harmed by Defendants' conduct.

348.    As a direct and proximate result of said acts by Defendants, PLAINTIFFS suffered injuries and damages as alleged herein and to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

349.    Defendants' acts constituted oppression, fraud and/or malice thereby entitling PLAINTIFFS to an award of exemplary and punitive damages against Defendants according to proof.

### EIGHTH CLAIM FOR RELIEF

**"Intentional Infliction of Emotional Distress"**

**(California State Common Law)**

*Against ARROYO, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

350.    PLAINTIFFS re-allege and incorporates by reference paragraphs 1 through 349, as though fully set forth herein.

351.    All PLAINTIFFS except MANZANO and MILAN bring a claim for the intentional infliction of emotional distress against ARROYO as set forth above. WIND and CAMERON also assert an intentional infliction of emotional distress claim against FELIX and RAMOLETE, as set forth above. YANCEY also asserts a claim for the intentional infliction of emotional distress against BECERRA as set forth above. MONROE also asserts a claim for the intentional infliction of emotional distress against ABREGO as set forth above. SALINAS also asserts a claim for the intentional infliction of emotional

39

distress against BECERRA as set forth above. CLARK also asserts a claim for the intentional infliction of emotional distress against BECERRA.

352.    Defendants engaged in extreme and outrageous conduct by repeatedly subjecting PLAINTIFFS to cruel and unusual punishment, excessive force, assault and/or battery, among other civil and criminal wrongs, which caused PLAINTIFFS to suffer severe mental and emotional distress.

353.    Defendants ARROYO, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 engaged in extreme and outrageous conduct, including using excessive and unnecessary force and by failing to protect PLAINTIFFS and other female inmates from unlawful and unconstitutional uses of force.

354.    Defendant ARROYO also engaged in extreme and outrageous conduct by discipling WIND after subjecting her to excessive force and imposing punishment even though he knew WIND had violated no CDCR policies and was innocent of wrongdoing.

355.    Defendant RAMOLETE also engaged in extreme and outrageous conduct by filing a false 115 or RVR against WIND and CAMERON, even though he knew that WIND and CAMERON had violated no CDCR policies.

356.    Defendant BECERRA engaged in extreme and outrageous conduct by filing a false Rules Violation Report against CLARK, even though he knew that CLARK violated no CDCR policies.

357.    Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 actions and inactions constituted oppression, fraud and/or malice resulting in great harm and thereby entitling PLAINTIFFS to an award of punitive damages against all individually named Defendants.

358.    PLAINTIFFS were injured as a direct and proximate result of Defendants ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 actions and inactions, entitling PLAINTIFFS to receive compensatory damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

## **NINTH CLAIM FOR RELIEF**

### **"Failure to Summon Medical Care"**

### **(California Civil Code Section 845.6)**

40

*Against ARROYO and DOES 1-60.*

359.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 358, as though fully set forth herein.

360.    All PLAINTIFFS except MANZANO and MILAN bring a claim for the failure to summon medical care against ARROYO.

361.    ARROYO and DOES 1 to 60 knew that PLAINTIFFS required immediate medical care as ARROYO saw PLAINTIFFS going into respiratory arrest, saw PLAINTIFFS foaming at the mouth and passing out, saw PLAINTIFFS urinating on themselves and vomiting while unconscious, and saw PLAINTIFFS being injured by the use of unlawful and unnecessary force. ARROYO also knew PLAINTIFFS had pre-existing medical conditions and had previously been diagnosed with having suffered strokes, suffering from asthma or PTSD, or were confined to a wheelchair, and saw these PLAINTIFFS being covered head to toe in pepper spray and tear gas.

362.    Medical providers saw PLAINTIFFS suffering from severe injuries and medical problems, and begged ARROYO to please allow them to treat PLAINTIFFS, and ARROYO refused to allow the medical providers to provide aid and medical care as needed. ARROYO denied medical providers the opportunity to render medical care to all PLAINTIFFS.

363.    Medical providers stationed at the scene of the attack by ARROYO were crying based on seeing ARROYO inflict pain and injury on PLAINTIFFS even though PLAINTIFFS were complying with all orders.

364.    The medical providers were crying because ARROYO denied them the ability to come to the aid of PLAINTIFFS and the medical providers knew that PLAINTIFFS required immediate medical care.

365.    ARROYO knew that all of the PLAINTIFFS were in need of immediate medical care and denied that care so that he could continue his unlawful and violent attack against PLAINTIFFS.

366.    Defendants ARROYO and DOES 1 to 60 actions and inactions constituted oppression, fraud and/or malice resulting in great harm and thereby entitling PLAINTIFFS to an award of punitive damages against ARROYO.

367.    PLAINTIFFS were injured as a direct and proximate result of ARROYO and DOES 1 to

41

60 actions and inactions, entitling PLAINTIFFS to receive compensatory damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

## TENTH CLAIM FOR RELIEF

### "Negligence"

### (California State Common Law)

*Against ARROYO, MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO and DOES 1 to 60*

368.    PLAINTIFFS re-allege and incorporate by reference paragraphs 1 through 367, as though fully set forth herein.

369.    All PLAINTIFFS except MANZANO and MILAN bring a claim for negligence against ARROYO for the use of excessive and unnecessary force, for setting in motion other officers using excessive force, for failing to intercede to prevent others at CCWF from using excessive and unnecessary force, and for the use of pepper spray and tear gas on PLAINTIFFS while they were complying with all orders and directions while posing no threat to any officer.

370.    WIND and CAMERON also assert a claim for negligence against FELIX and RAMOLETE, as set forth above. YANCEY also asserts a negligence claim against BECERRA as set forth above. MONROE also asserts a negligence claim against ABREGO as set forth above. SALINAS also asserts a negligence claim against BECERRA as set forth above.

371.    All PLAINTIFFS bring a negligence claim against MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO for failing to intercede and prevent the use of unlawful and unnecessary force, even though MENDOZA, FELIX, RAMOLETE, BECERRA, ABREGO knew and were aware that other officers were using excessive force on PLAINTIFFS, had the opportunity to stop it and failed to intercede.

372.    Defendants ARROYO, MENDOZA RAMOLETE, BECERRA, ABREGO and DOES 1 to 60 owed a duty to protect PLAINTIFFS and had a duty to use only appropriate force under federal and state law and breached those duties by using excessive and unnecessary force against PLAINTIFFS while housed at CCWF and by failing to protect PLAINTIFFS from injury caused by others.

373.    Defendants ARROYO, MENDOZA, RAMOLETE, BECERRA, ABREGO and DOES 1

42

to 60 had a duty to protect PLAINTIFFS and failed to ensure PLAINTIFFS were free from cruel and unusual punishment and failed to intervene to prevent correctional guards at CCWF from using excessive force, even though they personally witnessed officers spraying pepper spray and using tear gas grenades on PLAINTIFFS who were complying with all directions and orders. PLAINTIFFS posed no threat to any officer while being subjected to excessive and unnecessary force.

374.    Defendants ARROYO and DOES 1 to 60 were deliberately indifferent to PLAINTIFFS serious medical needs and failed to summon emergency medical care to PLAINTIFFS even though they knew PLAINTIFFS required and were in need of urgent medical care.

375.    PLAINTIFFS were injured as a direct and proximate result of Defendants' actions to which PLAINTIFFS are entitled to recover damages for past and future medical and psychological care, past and future pain and suffering, and past and future mental and emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS seeks judgment as follows:

1.    For an award of nominal, compensatory, general and special damages against Defendants according to proof at trial;

2.    For an award of exemplary/punitive damages against the individual Defendants and DOES 1 to 60, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions were motivated by evil motive or intent, involved reckless or callous indifference to constitutional or statutory rights, and constituted oppression, fraud or malice resulting in great harm;

3.    For an award of actual damages, treble damages, civil penalties and any other available relief against Defendants as allowed by law;

4.    For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, Cal. Civ. Code § 52.1, Cal. Civ. Code § 52.4, Cal Code of Civ. Proc. § 1021.5, and any other statute that may be applicable; and

5.    For an award of any other relief, as the Court deems fair, just and equitable.

Dated: July 23, 2025                              Respectfully Submitted,


By: */s/ Robert Chalfant_____*

43

Robert Chalfant
ROBERT CHALFANT LAW, PC
Attorney for Plaintiffs

## I.    DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 23, 2025                              Respectfully Submitted,


By: */s/ Robert Chalfant*_____
       Robert Chalfant
       ROBERT CHALFANT LAW, PC
       Attorney for Plaintiffs